1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2
            CASE NO.:  22-CV-60710-MGC
3

4
CHRISTOPHER GUARNIZO,
5
        Plaintiff,
6
-vs-
7
THE CHRYSALIS CENTER, INC.,
8
        Defendant.
9 _____/

10

11

12        DEPOSITION OF CHRISTOPHER GUARNIZO
                Pages 1 through 113
13                   Videotaped

14

15

              Tuesday, March 7, 2023
16           10:09 a.m. - 12:43 p.m.
              1533 Sunset Drive
17                Suite 150
              Miami, Florida 33143
18

19

20

21

22

23

24        Stenographically Reported By:
            Jennifer L. Bermudez, RPR
25        Registered Professional Reporter

Page 6

1     A.   Right now it's 2310 NW 204th Street, Miami
2  Gardens, Florida.
3     Q.   And what's the ZIP code on there?
4     A.   33056.
5     Q.   Do you own or rent?
6     A.   I am right now renting.
7     Q.   Do you have any plans on moving?
8     A.   I did.
9     Q.   You just moved now?
10    A.   Uh-uh.  No.
11    Q.   Okay.
12    A.   I had plans.  Those plans changed.
13    Q.   Okay.  Do you have any plans on moving from
14 2310 NW 204th Street in the next six months?
15    A.   No.
16    Q.   Who do you live with?
17    A.   My mother-in-law and my wife.
18    Q.   Okay.  I'm going to go through some
19 instructions that might be helpful.  The first is to
20 please let me finish the question before you begin to
21 answer because the court reporter cannot pick up two
22 people talking at one time.  Will you do that?
23    A.   Yes.
24    Q.   I don't want you to guess or speculate.  You
25 are, however, required to give your best recollection of

Page 7

1  the events I'm going to ask about.  Will you do that?
2     A.   Yes.
3     Q.   If you don't understand a question, please ask
4  me to rephrase the question and I will do my best to
5  rephrase the question so that it is understandable.
6  Will you do that?
7     A.   Yes.
8     Q.   If you want me to repeat the question, just
9  ask me to repeat the question and I will do that.  Okay?
10    A.   Okay.
11    Q.   What did you do to prepare for your deposition
12 today other than talk to your attorney?
13    A.   Nothing.
14    Q.   Did you review any documents in preparation
15 for your deposition?
16    A.   No.
17    Q.   Is there anything that would prevent you from
18 giving truthful testimony today?
19    A.   No.
20    Q.   When did you work for Chrysalis Health?
21    A.   Started five years ago.  Well, I was with the
22 company for five years.  The exact date I don't know.
23    Q.   What was -- what's your understanding as to
24 the reasons why you were terminated from Chrysalis
25 Health?

Page 8

1     A.   I was told that it was for a lack of
2  production.
3     Q.   Were you told anything else more specific?
4     A.   That I was, that I was stealing time.
5     Q.   And what do you think is the real reason that
6  you were fired?
7     A.   I don't know.
8     Q.   Okay.  There was a meeting -- you were fired
9  about December 2, 2020.  Does that sound right?
10    A.   I believe so.
11    Q.   Was that a Tuesday or Wednesday?
12    A.   I don't know.
13    Q.   And before you were fired you met with
14 Jennifer Blue from HR.  Correct?
15    A.   Correct.
16    Q.   Quiana Ewing who I think is now Quiana Barber.
17 Correct?
18    A.   Correct.
19    Q.   And was Luis Woodell also in on that meeting?
20    A.   Yes.
21    Q.   And that meeting took place via Teams?
22    A.   Correct.
23    Q.   And during that meeting did any of them tell
24 you that they were concerned that it appeared that you
25 were falsifying time records?

Page 9

1     A.   No.
2     Q.   Okay.  What was stated during that meeting?
3     A.   That productivity was low and that they would
4  have to let me go.
5     Q.   Is that it?
6     A.   Yes.
7     Q.   What was your response?
8     A.   "Okay."
9     Q.   Do you believe that your productivity was low?
10    A.   No.
11    Q.   Is there anything that you know of -- well,
12 they didn't tell you why they believed the productivity
13 was low?
14    A.   No.
15    Q.   As you sit here today, do you have an idea as
16 to their thinking as to why your productivity was low?
17    MR. CUMMINGS:  Objection to the form.
18    Q.   (By Mr. Costales) Well, let me rephrase the
19 question.
20    As you sit here today, have you learned
21 Chrysalis's defense in this case?
22    And let me be more specific.  Have you learned
23 that Chrysalis reviewed time records and found that
24 there were times that were missing from your
25 productivity and that's why you were fired?

Page 10

1    A.   I was informed of this later.
2    Q.   Later.  Okay.  When was that?
3    A.   I don't have -- I don't recall the exact date.
4    Q.   Now, Chrysalis documents performance
5  deficiencies.  Correct?
6    A.   Correct.
7    Q.   And I think you were written up a few times
8  over the years -- right? -- at Chrysalis?
9    A.   Yes.
10   Q.   How many different companies have you worked
11 for in your adult life?
12   A.   I can't recall all of them.
13   Q.   Well, how long have you been in the workforce?
14   A.   Since I was 14.
15        Okay.  How old are you now?
16   A.   32.
17   Q.   What's your date of birth?
18   A.   2/19/1991.
19   Q.   Okay.  And would you say that Chrysalis
20 documents performance deficiencies more so than previous
21 employers you may have worked for?
22        MR. CUMMINGS:  Objection to the form.
23        You can answer.
24   A.   More than others.
25   Q.   (By Mr. Costales) After the December 2, 2020,

Page 11

1  meeting when you were told that you were being fired,
2  Chrysalis generated some paperwork that reflected the
3  termination meeting.  Would you agree with that
4  statement?
5    A.   Yes.
6    Q.   Okay.  I'm going to show you what we will mark
7  as Exhibit No. 1.
8        (Exhibit 1 was marked for identification.)
9    Q.   (By Mr. Costales) Okay.  So this is dated
10 December 2, 2020.  Correct?
11   A.   Yes.
12   Q.   Okay.  And when was the first time you saw
13 this document?
14   A.   Now.
15   Q.   Well, you produced it to me in discovery so
16 you must have seen it before.
17   A.   Not with this date.
18   Q.   11/18/2020?
19   A.   Correct.
20   Q.   Okay.  Well, I can get the copy that you
21 provided but it's not --
22   A.   Please.
23   Q.   -- it will say -- you want the copy that you
24 provided?
25   A.   Please.

Page 12

1    Q.   The copy that you provided we provided to you,
2  I believe.  Did you ever -- let me ask, let me ask it
3  this way:  Did you receive a copy of this document that
4  said "Exhibit 1" before you filed the lawsuit?
5    A.   I requested one that was never sent to me.
6    Q.   Okay.  You requested some progressive
7  disciplinary reports or something.
8    A.   Correct.
9    Q.   Okay.  Well, on a break I will get the copy
10 that you provided in discovery so that we can move
11 things along, and I think that you got it from us.
12        But in any case, let's look at the statement
13 there.  It says Director Lewis Woodell, Supervisor
14 Quiana Ewing, and Chief People and Experience Officer
15 Jennifer Blue met with Mr. Guarnizo to address time and
16 attendance, productivity during October and November,
17 and professional standards.
18        Do you see that there?
19   A.   Uh-huh.
20   Q.   Do you agree with that statement?
21   A.   I see the statement.  Yes.
22   Q.   Well, that sort of goes back to what I asked
23 you about before.  You met with Quiana, Lewis, and
24 Jennifer right before you were fired.  Correct?
25   A.   On the day I was let go.

Page 13

1    Q.   On the day you were let go.  And the day you
2  were let go was December 2, 2020.  Correct?
3    A.   I believe so.
4    Q.   Okay.  All right.  So that's a true statement,
5  that first sentence.  Correct?
6    A.   Correct.
7    Q.   Okay.  And the next sentence reads Upon
8  review, there were days no work was conducted and days
9  with as little as three hours conducted when full-time
10 employment is eight hours per day or 40 hours per week.
11        Do you see that there?
12   A.   I do.
13   Q.   Okay.  Did either Quiana, Jennifer, and Lewis
14 say anything to that effect during the meeting that you
15 had with them on December 2, 2020?
16   A.   I don't recall those exact words, but if it's
17 here then apparently they did.
18   Q.   Right, exactly.  They may not -- there may not
19 be a verbatim statement of what they told you, but you
20 would agree that the substance of what's in that
21 sentence is what was discussed during the meeting on
22 December 2, 2020, when you were fired.  Correct?
23   A.   Again, I was told that it was for lack of
24 productivity.  That was it.
25   Q.   Okay.  But did they tell you that there were

Page 14

1  days when the computer records showed that there was as
2  little as three hours worked, or words to that effect?
3      A.   No.  I was told that it was only for
4  productivity.  I was not told about hours that I was
5  working.
6      Q.   Okay.  The next sentence reads Breaks and time
7  off taken that were not reflected in your time sheet is
8  considered misrepresentation of time worked and false
9  timekeeping for pay received but not working for
10 Chrysalis.
11           Do you see that there?
12     A.   I see it.
13     Q.   Okay.  Did either Lewis, Jennifer, or Quiana
14 say anything about breaks and time-off taking?  Anything
15 to that effect?
16     A.   No.  And, again, this is 2020, we're in 2023,
17 so I don't, I'm not sure 100 percent.
18     Q.   You are not sure 100 percent that was stated
19 during the meeting?
20     A.   That it was stated.  Yes, that it was stated.
21     Q.   Okay.  But it might have been told to you?
22     A.   Possible.
23     Q.   Now, there's attachments to this -- what's
24 that? -- Exhibit 1, which has logins to eCR.  Do you see
25 that there?

Page 15

1      A.   Yes.
2      Q.   Okay.  And what is eCR?
3      A.   ECR is the program that they use to keep track
4  of documents.
5      Q.   Okay.  Did Chrysalis provide you with copies
6  of what's here in Exhibit 1 in the attachment at any
7  time?
8      A.   I requested, I requested information on those
9  logs and this is what they sent me.
10     Q.   Okay.  And when did they send that to you?
11     A.   Exact date I am not sure.
12     Q.   Okay.  Was it after you were fired?
13     A.   Yes.
14     Q.   Was that not presented to you during the
15 meeting?
16     A.   No.
17     Q.   Give me a moment.  I think I have the email
18 where that was sent to you.
19           Jennifer Blue sent you this document after you
20 asked for it.  Correct?
21     A.   After I requested this information, she sent
22 it, correct.
23     Q.   Okay.  All right.  I'm going to show you what
24 has been marked as Exhibit, what will be marked as
25 Exhibit No. 2.

Page 16

1            (Exhibit 2 was marked for identification.)
2      Q.   (By Mr. Costales) Okay.  So the meeting was on
3  December 2, 2020.  Correct?
4      A.   Uh-huh.
5      Q.   You have to say "yes," for the record.
6      A.   Sorry.  Sorry.  Yes.
7      Q.   And that's another instruction that I should
8  have given, which is to remember to give verbal
9  responses to all of my questions because the court
10 reporter cannot pick up shakes of the head or nods of
11 the head.
12     A.   Right.
13     Q.   So this is an email that you sent on
14 December 3, 2020, to Jennifer Blue.  Correct?
15     A.   Correct.
16     Q.   Okay.  And this is where you ask for
17 productivity reports for the months of November and
18 October.  Correct?
19     A.   Correct.
20     Q.   Okay.  And then as a result Jennifer sent you
21 the attachment that's at Exhibit 1.  Correct?
22     A.   Correct.
23     Q.   And that would be the 10/05, where at the top
24 it says 10/05 logged into eCR at 8:09.  Right?
25     A.   Correct.

Page 17

1      Q.   Now, when you -- how did you feel when you
2  were fired?  Were you surprised?
3      A.   I was surprised.  I was surprised that it
4  wasn't something that I expected.
5      Q.   Were you mad?
6      A.   Not angry.
7      Q.   Surprised?
8      A.   Surprised.
9      Q.   Did you -- at the time, in the months before
10 you were fired you were working remotely.  Correct?
11     A.   That's correct.
12     Q.   And you started to work remotely earlier than
13 other Chrysalis employees during the COVID pandemic
14 because you made a request to work earlier.  Correct?
15     A.   That's correct.
16     Q.   Or, I'm sorry, you made a request to work
17 remotely earlier than other employees.  Right?
18     A.   That's correct.
19     Q.   And Chrysalis granted that request?
20     A.   Yes.
21     Q.   Chrysalis has never denied any request for
22 leave that you made.  Correct?
23     A.   Correct.
24     Q.   Chrysalis has never denied any request from
25 you to go to a doctor's appointment?

Page 18

1  A.  No.
2  Q.  Chrysalis has never asked you to reschedule a
3  doctor's appointment to suit their work schedule?
4  A.  Correct.
5  Q.  Chrysalis has not prevented you from being
6  late or tardy because of a doctor's appointment?
7  A.  Correct.
8  Q.  So there's not one instance when Chrysalis
9  denied a request for any type of leave having to do with
10 anything, having to do with anything concerning medical,
11 your medical condition.  Correct?
12 A.  That is correct.
13 Q.  Okay.
14     All right.  So going back to Exhibit 2, so you
15 go to this meeting -- and this was all on Teams, I
16 guess, when you were fired?
17 A.  That is correct.
18 Q.  Okay.  And did they show documents on the
19 screen during the meeting?
20 A.  No.
21 Q.  Now, at that meeting did you have an idea, did
22 you get the impression that there were concerns that
23 there were entries in the eCR computer system which
24 reflected that there were long periods of time when
25 there was no work while you were working remotely?

Page 19

1     MR. CUMMINGS:  Objection to the form.
2  A.  Can you repeat that?
3  Q.  (By Mr. Costales) It's kind of a long
4  question.
5  A.  Yeah.
6  Q.  Did you get the impression during the
7  termination meeting that you were being fired because
8  Jennifer and/or Quiana and/or Lewis believed that there
9  were long periods of time in the computer records which
10 showed that no work was conducted while you were working
11 remotely?
12 A.  No.  I found it odd that it was a meeting with
13 three people.
14 Q.  Okay.  What was odd about that?
15 A.  Usually a meeting regarding productivity is a
16 one-on-one with the manager.
17 Q.  Okay.  Well, in any case, you were surprised,
18 and as a result you wrote this email that's on, that's
19 in Exhibit 2 on December 3.  Correct?
20 A.  That's correct.
21 Q.  Okay.  So it's a well-written email.  Did you
22 put a long time into this or how long -- did you write
23 this?
24 A.  I did write this.
25 Q.  Okay.  Did you write this with the assistance

Page 20

1  of an attorney or anybody?
2  A.  No.
3  Q.  And how long did it take you to write?
4  A.  All night.
5  Q.  All night?
6  A.  Correct.
7  Q.  Okay.  Because you wanted it to be . . .
8  A.  Professional.
9  Q.  Professional.  As good as possible.  You were
10 disappointed or upset, I don't mean to put words in your
11 mouth, but you felt bad because you were fired.
12 Correct?
13 A.  Correct.
14 Q.  And you wanted to address the situation?
15 A.  Yes.
16 Q.  Okay.  So did you talk to anybody when you
17 prepared this email?
18 A.  No.
19 Q.  Did you review any documents or anything?
20 A.  What I was sent.
21 Q.  Okay.  What were -- which is at Exhibit 1?
22 A.  That is correct.
23 Q.  Okay.  All right.  So before you wrote this
24 email that's at Exhibit 2, the December 3 email, you had
25 received these logins from Jennifer.  Correct?

Page 21

1  A.  Yes.
2  Q.  Okay.  And would you agree that the logins
3  that are in Exhibit 1 show no activity for hours at a
4  time on different days?
5  A.  I agree that, I understand that that's what it
6  says, yes.
7  Q.  Okay.  So do you know -- what were you doing
8  during those times?
9  A.  There were many occasions in which eCR, which
10 is the system that they use to keep track, would crash,
11 in which case we would request information from Quiana
12 as to when it was working again.
13 Q.  Okay.  Would it crash an entire day?
14 A.  It would crash periodically throughout the
15 day.
16 Q.  Periodically throughout the day.  And what
17 would you do when it crashed?
18 A.  Clock out.
19 Q.  Would you email Quiana?
20 A.  We would email Quiana and clock out.
21 Q.  Okay.  Did you email Quiana on any of these
22 days about a crash?
23 A.  I don't remember.
24 Q.  Do you save your emails from Chrysalis?
25 A.  They were saved on the computer that belonged

Page 22

1  to Chrysalis.
2      Q.   Okay.  The entry for 10/29 says Nothing worked
3  for the entire day, and then 10/30 Nothing worked for
4  the entire day.  Correct?
5      A.   That's correct.
6      Q.   And then you got paid for 10/29 and 10/30.
7  Right?
8      A.   I assume.  I'm not sure.
9      Q.   Okay.  Did you hand in time sheets for those
10 days?
11     A.   Time sheets weren't handed.  It was an email
12 saying Clock in, clocked out.
13     Q.   Okay.  Okay.  So if the system had crashed on
14 those days, 10/29 and 10/30, are you saying that maybe
15 the system crashed the entire day for two days straight?
16     A.   There were days when, yes, this is a
17 possibility.
18     Q.   Okay.  So there are days when the eCR system
19 is down two entire days?
20     A.   Correct.
21     Q.   Okay.  Did you mention this crash in the
22 December 3 email that's at Exhibit 2?
23     A.   I don't recall.
24     Q.   Okay.  Well, let's look at it.
25     A.   Sure.

Page 23

1      Q.   The first sentence -- well, you can -- the
2  first sentence says I wanted to follow up with you from
3  yesterday's meeting to re-establish a few things.  I
4  know you asked if I could take my equipment back to the
5  office today, but unfortunately I will not be able to do
6  so.  As I've mentioned before to Quiana, I'm getting
7  married today, so hence my last request for PTO.
8  Correct?
9      A.   That's correct.
10     Q.   Okay.  So you didn't mention anything there
11 about this computer crash there.  Correct?
12     A.   That's correct.
13     Q.   And, by the way, is there any other reason
14 that you can think of why the system would not have you
15 logged in as doing work as per Exhibit 1?
16     A.   I'm sorry?
17     Q.   Well, when I asked about reasons why the
18 system, the eCR system would show that you weren't doing
19 any work as per Exhibit 1, you said that sometimes the
20 system crashes.  Correct?
21     A.   Yes.
22     Q.   Okay.  Is there any other reason why there
23 would be no activity for long periods of time as
24 reflected in Exhibit 1?
25     A.   No.  None other than it crashing.

Page 24

1      Q.   Okay.  And, as you sit here today, you don't
2  know what you were doing on these particular days.
3  Correct?
4      A.   That is correct.
5      Q.   Okay.  So, for instance, on 10/5 it says No
6  activity from 1:57 to 14:22.  That's a little bit over
7  an hour.  Right?
8           We don't have to go through all of them, but
9  there's long periods of time here, sometimes hours at a
10 time, sometimes two whole days when --
11     A.   About two hours.
12     Q.   Yeah -- the system reflected no work.  Okay.
13          So you had -- when you were given these time
14 records that are Exhibit 1, you had time to look at
15 them.  Right?
16     A.   Right.
17     Q.   And then you spent all night working on this
18 December 3 email that's at Exhibit 2.  Right?
19     A.   Right.
20     Q.   So did it occur to you to -- did you review
21 any records or anything to see why the system would
22 reflect no activity worked on that day?
23     A.   We have no access of knowing why the system
24 isn't working.
25     Q.   Okay.

Page 25

1      A.   We were just told it's crashed.
2      Q.   All right.  You have a cell phone.  Correct?
3      A.   I do.
4      Q.   And when you worked at home -- did you check
5  your cell records to see maybe what would have been
6  going on during these times?
7      A.   We don't get texts.  We are told by email.
8      Q.   I understand that.  But Chrysalis is saying
9  that, Look, according to our records there's long
10 periods of time when you are not working remotely.
11 Right?
12     A.   That's right.
13     Q.   And you got fired as a result.  Would you
14 agree with that?
15     A.   Yes.
16     Q.   Okay.  And you got these time records, which
17 in their mind establishes that you weren't working for
18 these time periods.  Correct?
19     A.   Correct.
20     Q.   You were very concerned about being fired.
21 Right?
22     A.   Again, it came as a surprise.
23     Q.   It came as a surprise, right.  And you worked
24 all night on this email that's Exhibit 2.  Right?
25     A.   Right.

Page 26

1   Q.  Okay.  So would you have not have done
2  everything in your power to determine what exactly you
3  were doing during these times that are listed in Exhibit
4  1?
5       Well, let me put it this way:  Did you do
6  anything to determine what activities you may have been
7  engaging in during the times that are reflected on
8  Exhibit 1?
9       A.  No.  We sat and we waited for an email to come
10 regarding the active -- if the system is working.
11      Q.  If the system is . . . Okay.
12      A.  Correct.
13      Q.  But you didn't check your cell phone during
14 these times to see maybe if you were calling someone for
15 a work-related reason or anything.  Right?
16      A.  No.
17      Q.  You don't have a calendar at home?
18      A.  Of course I have a calendar at home.
19      Q.  You do?  Okay.  So do you keep -- not
20 everybody does -- so do you keep track of different
21 appointments and things of that nature on your calendar
22 at home?
23      A.  Rare, rare occurrences, medical appointments.
24      Q.  Okay.  Did you look at your calendar before
25 you prepared the email that's at Exhibit 2?

Page 27

1       A.  No.
2       Q.  Okay.  Did you -- okay.  Well, in any case,
3  you didn't really -- you didn't do anything to determine
4  what you were doing during these time frames but you
5  wanted to get more reports from Chrysalis.  Correct?
6       A.  Correct.
7       Q.  Okay.  Did you -- you got married around that
8  time.  Right?  What day did you get married?
9       A.  The exact, I don't remember.
10      Q.  Actually, it says -- you don't remember your
11 anniversary?
12      A.  The thing is --
13      Q.  Because you are a newlywed, come on.
14      A.  I know, I'm a bad husband.
15      Q.  All right.  So it says December 3 I'm getting
16 married today, so that must be your anniversary date.
17 Right?
18      A.  Okay.
19      Q.  Would you agree with that?
20      A.  If it says that.
21      Q.  Okay.
22      A.  Because we had to move dates.  We had
23 different dates planned for the marriage.
24      Q.  Oh, I see.  I see.  Okay.
25      A.  Which is why we -- we're not, my wife and I

Page 28

1  aren't 100 percent on what day we should celebrate our
2  anniversary.
3       Q.  Okay.
4       A.  So we just do it the 3rd or the 4th.
5       Q.  Okay.  You had a civil ceremony?
6       A.  We went to the courthouse.
7       Q.  Okay.  Did you also do a reception and all
8  that stuff, or a big party?
9       A.  No, just paperwork, no party.
10      Q.  No paperwork.  Okay.  Did you have to do any
11 preparations for getting married?
12      A.  No.
13      Q.  Okay.  Were you working on anything having to
14 do with getting married during these time frames that
15 are listed on Exhibit 1 in October?
16      A.  No.
17      Q.  Okay.
18      All right.  The next paragraph begins, we're
19 going back to Exhibit 2, I want to confirm that I will
20 be given reports showing my decrease in productivity for
21 the months of October and November that we spoke about
22 yesterday.
23      Do you see that there?
24      A.  Yes.
25      Q.  Okay.  So -- but you have already gotten these

Page 29

1  reports that are listed at Exhibit 1.  Right?
2       A.  That is right.
3       Q.  Okay.  So what additional reports were you
4  talking about there?
5       A.  November.  For the month of November.  They
6  sent me October.
7       Q.  Okay.  And what would November show?
8       A.  I'm not sure.  November would show possibly
9  the same thing.
10      Q.  Like, long periods of time missed?
11      A.  Possibly.  Again, the system crashes every now
12 and then.  I have no control over that.
13      Q.  Okay.  The next sentence says I will also be
14 requesting reports or a write-up that was brought to my
15 attention in earlier months during the beginning of the
16 pandemic for this same matter.  Do you see that there?
17      A.  Yes.
18      Q.  Okay.  What write-up are you talking about
19 there?
20      A.  We had a verbal, a verbal discussion, Quiana
21 and I, in which I had requested a report.  She had told
22 me it was only going to be verbal, nothing would be
23 written up.
24      Q.  But what did the report concern?
25      A.  It concerned the same thing, my productivity.

Page 30

1  I wanted to know why this is a problem.
2     Q.   Okay.  Well, we keep saying productivity but
3  -- I realize it's called that but it's also -- Chrysalis
4  managers informed you that they believed that you were
5  not working during times that you were supposed to be
6  working remotely.  Correct?
7     A.   They believed.
8     Q.   They believed that.  You agree with that, they
9  had a belief on that.
10    A.   They had a belief.
11    Q.   Right.  And they looked at what's in the
12 system here, Exhibit 1, the entries, and they formed a
13 belief that you weren't working for long periods of time
14 while you were at home.  Correct?
15         MR. CUMMINGS:  Objection.  Asked and answered.
16    Q.   (By Mr. Costales) Okay.  Well, anyway, they
17 believed that.  So if they believed that, why would
18 getting the November reports have anything to do, to
19 dissuade them of that belief?
20    A.   Because it's a person's belief.  I want to see
21 if it's true.  I want the dates.
22    Q.   Okay.  But they were concerned about long
23 periods of time when you weren't working in October.
24    A.   Yes.
25    Q.   What, if anything, did you do to try to

Page 31

1  dissuade them of this belief that you were not working
2  remotely when you said that you were?
3     A.   There's no way to dissuade somebody's already
4  predetermined mentality on something.  If somebody
5  believes it, they are going to believe it.  I can tell
6  you A and if you are already thinking B there's no
7  point.
8     Q.   Okay.  So what was -- so the purpose of this
9  email that was at exhibit, that's Exhibit 2, the
10 December 3 email, then the purpose, the purpose of this
11 email was not to dissuade them of this belief that you
12 had stolen time.  Correct?
13    A.   It was to have records.
14    Q.   Have records.  Okay.  It wasn't, it wasn't --
15 so this email wasn't meant to -- this email wasn't part
16 of an effort for you to let them know that in fact you
17 hadn't stolen any time?
18    A.   No.  This was an email to know the certain
19 dates and the reason they were getting, I was getting
20 fired.
21    Q.   Okay.  All right.  And, again, the report, and
22 forgive me, sometimes I forget things, but the report at
23 the second sentence, the second paragraph you are
24 requesting a report of a write-up, and you said that you
25 and Quiana had a meeting -- oh, I know what you said.

Page 32

1  You said that this was concerning a meeting that you had
2  about productivity.  Right?
3     A.   That is correct.
4     Q.   Okay.  But it wasn't a meeting about a
5  suspicion that you were stealing time from the company.
6  Correct?
7     A.   No.
8     Q.   Right.  And then the next sentence says I was
9  told that I would be given documentation for it but
10 never received it.  Do you see that there?
11    A.   Yes.
12    Q.   And, again, you are asking for that just for
13 your own records?
14    A.   Yes.
15    Q.   Okay.  Between August and September after a
16 group meeting Quiana via phone informed me there would
17 be no write-up and solely be a warning.
18         Do you see that there?
19    A.   Yes.
20    Q.   Okay.  So I guess you were thinking that --
21 well, I'm not sure, I'm not going to guess what you were
22 thinking.
23         What was your thought process there?  Like,
24 why would you need the -- why was it significant that
25 the write-up wouldn't solely be a warning?

Page 33

1     A.   I'm sorry?
2     Q.   Why is that, why is that noteworthy, that
3  Quiana informed you that there would be no write-up and
4  solely be a warning?
5     A.   If I have documentation of this so-called
6  write-up, I can then ask them and show them look, this
7  was not a write-up, this was a verbal warning, why am I
8  being fired, my records show such and such.
9     Q.   Okay.  Yesterday afternoon -- I'm reading the
10 next sentence -- I attempted to access my Paycom to
11 finish inputting my hours for the week and to print my
12 paystubs but was unable to do so.
13         Do you see that there?
14    A.   Yes.
15    Q.   I would like to input my hours and verify if
16 my times from last week were also entered.  I will be
17 needing copies of all of my paystubs dated from January
18 of this year up to that date.
19    Q.   Okay.  So in the first sentence you are asking
20 for access to Paycom records so you can finish inputting
21 hours.  Right?
22    A.   That is correct.
23    Q.   Okay.  And is that just part of your normal
24 inputting of work hours?
25    A.   It is.

Page 34

```
1      Q.   In the next sentence you wrote I would like to
2  input my hours and verify if my times from last week
3  were also entered.  Do you see that there?
4      A.   Yes.
5      Q.   Did you already enter a time for the previous
6  week?
7      A.   Yes.  It was done for the previous week so
8  that Quiana could look it over and approve or
9  disapprove.
10     Q.   Did you write that because you were concerned
11 about getting your last paycheck?
12     A.   That is correct.
13     Q.   You were hourly.  Correct?
14     A.   Yes.
15     Q.   You also asked for copies of paystubs from
16 January of this year up to date.  Do you see that?
17     A.   Yes.
18     Q.   Why did you need paycheck stubs?
19     A.   I wanted to make sure I wasn't being cheated
20 out of money that I have worked.
21     Q.   Did you have any reason to believe that
22 Chrysalis would cheat you out of money?
23     A.   No.  But, again, I want records of it.
24     Q.   Did Chrysalis ever, was Chrysalis ever late in
25 paying you?
```

Page 35

```
1      A.   No.
2      Q.   Did they ever not pay you for all hours
3  worked?
4      A.   Again -- no.
5      Q.   Okay.  You were concerned about making sure
6  you were paid for all the hours that you worked.
7  Correct?
8      A.   That is correct.
9      Q.   But that's not based on anything that
10 Chrysalis had done or failed to do in the past?
11     A.   That's correct.  I just wanted paystubs.
12     Q.   And on the flip side, I guess, Chrysalis was
13 concerned that they were getting what they paid for,
14 which was work from you.  Right?
15     A.   That's correct.
16          MR. CUMMINGS:  Objection to the form.
17     Q.   (By Mr. Costales) Did you have any other
18 sources of income while you worked for Chrysalis?
19     A.   No.
20     Q.   Did you have any other jobs while you worked
21 for Chrysalis?
22     A.   No.
23     Q.   Did you have a work station at home while you
24 worked for Chrysalis remotely?
25     A.   An actual station, no.
```

Page 36

```
1      Q.   What computer did you use while you worked for
2  Chrysalis?
3      A.   The laptop that they provided me.
4      Q.   And you returned that after you were fired.
5  Correct?
6      A.   When I was able to bring it back to them, yes.
7      Q.   Now, you said in the complaint that you had
8  cancer.  Correct?
9      A.   That is correct.
10     Q.   When did you have cancer?
11     A.   When I was three.
12     Q.   You had leukemia?
13     A.   That's correct.
14     Q.   Was it cured?
15     A.   I went into remission at the age of six.
16     Q.   Has it returned?
17     A.   No.  But there are still scares.
18     Q.   I'm sorry?
19     A.   There are still scares.  Certain situations --
20     Q.   Can you spell that?  Oh, scares, s-c-a-r-e-s?
21     A.   Yes.
22     Q.   Okay.  What are the scares?
23     A.   I have had and prior and still to this day
24 certain situations where I go to the restroom and there
25 is blood.
```

Page 37

```
1      Q.   You sent some time records; isn't that because
2  of hemorrhoids?
3      A.   We thought it could be hemorrhoids.  We wanted
4  to be tested.  Well, I wanted to be tested.
5      Q.   What does having rectal bleeding or
6  hemorrhoids have to do with having leukemia at the age
7  of three?
8      A.   It could be anything.  You don't know what
9  brings it back.
10     Q.   Did any doctor tell you this?
11     A.   No.
12     Q.   This is something that -- was this from
13 Dr. Google?  Like, you Googled that or something?  Or
14 how did you find that out?
15     A.   No, we are assumptions.  We don't like to take
16 risks.  My mother and I don't like to take risks.
17     Q.   No, what I'm getting at is, I don't mean to be
18 flippant, but did a doctor tell you that the
19 aftereffects of leukemia could manifest themselves at
20 any time, like what you just said?
21     A.   I don't know what the outcomes or the, yeah,
22 the outcomes could be of chemotherapy over so many
23 years.
24     Q.   Do you have any children?
25     A.   I do not.
```

Page 38

1    Q.   How does having had leukemia at the age of
2 three affect you today?
3    A.   The radiation.  I can't have children.
4    Q.   Are you -- were you told that by a doctor?
5    A.   Yes.
6    Q.   They said it with a hundred percent certainty?
7    A.   They said it with a hundred percent certainty.
8 Radiation done to my, pardon my word, my testicles has
9 caused it impossible for me to have children.
10   Q.   Okay.  And how else does it affect you?
11   A.   It's affected the -- I have calcification on
12 one side of my brain, which in turn doctors informed me
13 is the reason for my epilepsy.
14   Q.   Did you provide documents concerning your
15 epilepsy in connection with this case?
16   A.   Did I provide, I'm sorry?
17   Q.   Did you provide any documents concerning
18 epilepsy?
19   A.   Oh, no.  They knew about it.
20   Q.   Who is "they"?
21   A.   The company.  This was a verbal discussion
22 multiple times.
23   Q.   Chrysalis?
24   A.   That is correct.
25   Q.   Okay.  Did anybody at Chrysalis know that you

Page 39

1 had had cancer when you were three years old?
2    A.   The owner.
3    Q.   Who is the owner?
4    A.   Manny Menendez, I believe is his last name.
5    Q.   And how would he have known?  Did you tell
6 him?
7    A.   Yes.
8    Q.   When did you tell him?
9    A.   When I was hired.  He knows my mother, I
10 believe it is.
11   Q.   And your stepfather still works for Chrysalis
12 Health.  Correct?
13   A.   I'm not sure if they are married still, but I
14 assume.
15   Q.   Oh, you don't know if your mom is still
16 married to your stepfather?
17   A.   Yeah, correct.
18   Q.   You don't talk to your mom?
19   A.   I don't talk to my stepfather.  I see my mom
20 occasionally.
21   Q.   All right.  So in any case, tell me about this
22 conversation you had with Manny about childhood
23 leukemia.
24   A.   That's a long time ago.  I'm not sure.  I was
25 hired in the company for, I believe, in 2015, was there

Page 40

1 for five years, so . . . We're in 2023.  It's been a
2 while.
3    Q.   Okay.  So as you sit here today, you don't
4 remember what you might have told Manny Menendez about
5 having childhood leukemia but you do remember that you
6 told him?
7    A.   Yes.  Because I tell everyone.
8    Q.   But -- okay.  And how would that have come up
9 in a meeting when you were hired?
10   A.   I just tell people in case they see something
11 happening to me that they are aware of my medical
12 history.
13   Q.   You said that you have epilepsy.  Correct?
14   A.   That is true.
15   Q.   Do you take anything for that?
16   A.   Yes, I do.
17   Q.   What do you take?
18   A.   I take two different types of medication:
19 Keppra and Lamictal.
20   Q.   Keppra -- can you spell that?
21   A.   Yeah.  K-e-p-p-r-a.
22   Q.   And?
23   A.   Lamictal.  L-a-m-i-c-t-a-l.
24   Q.   What kinds of seizures do you have?
25   A.   Currently I'm having, I have what's called

Page 41

1 absent seizures, there are times when I am unable to
2 speak.  So it could happen today, I don't know.  Those
3 come and go randomly.
4    Q.   When was the first time you were diagnosed
5 with having epilepsy?
6    A.   I believe, I'm not sure, I was in freshman
7 year of high school, I think.
8    Q.   Did you have any type of seizures?
9    A.   Yes.
10   Q.   What kind of seizure?
11   A.   I would have, I would wake up from a seizure
12 and have med -- what's it called?  Oh, my God, what's it
13 called?
14   Q.   There's grand mal seizures, petit mal
15 seizures.
16   A.   I would have the whole shaking.
17   Q.   Shakes, right.
18   A.   My tongue would be bit.  And I would have, I
19 would wake up to paramedics around my bed.
20   Q.   Were you told that you had a grand mal
21 seizure?
22   A.   I was told that I had a seizure and that's why
23 they were there.  They happened at night.
24   Q.   How many seizures have you had in your life?
25   A.   I had about, I don't know, like, possibly four

Page 42

1  or five, but they have been at night.
2       Q.   And is this an absent seizure that you are
3  talking about or like a grand mal?
4       A.   No, this is a full-fledged grand mal seizure.
5       Q.   And when was the last one that you had?
6       A.   Very -- a while ago.  I'm not sure when.
7  Thankfully because of the medication.
8       Q.   Okay.  You said that there is a calcification
9  of the brain.  Could you explain that?
10      A.   I was informed by doctors when they did a scan
11  that there is a sort of hardening, I think is what you
12  can call it, on part of my brain which in turn can cause
13  these seizures.  That's what I was informed by doctors.
14      Q.   Okay.  Did any of that affect your job at
15  Chrysalis?
16      A.   There were times when I had to go to the
17  doctor, but I would, I would say no, may -- I don't
18  remember.
19      Q.   How else did -- and leukemia is a cancer of
20  the blood, basically.  Correct?
21      A.   That's correct.
22      Q.   It affects your -- does it ever affect one
23  part of the body more than others, or it's just in your
24  blood?
25      A.   It's in my blood.

Page 43

1       Q.   Okay.  So there's no particular part of your
2  body that's affected?  Okay.  You have to say no, for
3  the --
4       A.   Sorry.  Sorry.  Sorry.  Yeah.  No.
5       Q.   Okay.  So how else did having childhood
6  leukemia, or how else does it affect you today, if at
7  all?
8       A.   I can't donate any blood so I can't help
9  others.
10      Q.   Is that it?
11      A.   Other than the leukemia and not having
12  children, yes.
13      Q.   You can drive a car?
14      A.   Yes.
15      Q.   Has any medical practitioner ever told you
16  that you should not drive a car?
17      A.   No.
18      Q.   You are able to work.  Correct?
19      A.   Correct.
20      Q.   How many jobs have you had after Chrysalis?
21      A.   I had after Chrysalis two jobs.
22      Q.   Okay.  What were they?
23      A.   I worked HR, human resources, in Mount Sinai.
24      Q.   Uh-huh.
25      A.   And then I worked security for Tiffany's in

Page 44

1  Bal Harbour.
2       Q.   Are you working now?
3       A.   I am.
4       Q.   What do you do?
5       A.   I'm operations specialist for Ralph Lauren.
6       Q.   What does that mean?
7       A.   I handle receiving and shipping of
8  merchandise.
9       Q.   Okay.  We will go back to that.  Did there
10  come a time when you started to make the same money or
11  more money than when you worked at Chrysalis?
12      A.   Yes.
13      Q.   Okay.  When was that?
14      A.   When I started in Mount Sinai.
15      Q.   Was there another, a time that you worked at
16  some sort of personnel service or something called Leeds
17  or something to that effect?
18      A.   There was, they were a hiring company, I
19  believe.
20      Q.   Do you know if Manny Menendez had anything at
21  all to do with your termination?
22      A.   I don't know.
23      Q.   Do you have any reason to believe that Manny
24  Menendez would have told Jennifer Blue about your having
25  had childhood leukemia?

Page 45

1       A.   I have no idea.
2       Q.   Do you have any reason to believe that Manny
3  Menendez would have told Quiana Ewing that you had had
4  childhood leukemia?
5       A.   She would know.
6       Q.   How would she know?
7       A.   Because I informed her of it.
8       Q.   When did you inform her of that?
9       A.   Again, I tell all of my coworkers, so it could
10  have been when I first started.
11      Q.   Okay.
12      A.   I was friendly with everyone.
13      Q.   All right.  So you are saying that you might
14  have told her that you had childhood leukemia just in
15  passing in general conversation?
16      A.   Correct.
17      Q.   But you don't have a specific recollection as
18  to telling Quiana Barber that you had had childhood
19  leukemia?
20      A.   That's correct.
21      Q.   Did your child -- does your childhood
22  leukemia, what does that have to do with the lawsuit?
23      A.   The leukemia can affect my body.  It's a
24  blood, it's a blood cancer, it's a cancer in the blood.
25  So bleeding can affect it in any way, which is why I was

Page 46

1  tested.
2     Q.   You had stated in the complaint that you
3  needed, around the time of your termination, I think in
4  October or so, you had gone for a colonoscopy.  Correct?
5     A.   That's correct.
6     Q.   And you needed three or four days off after
7  that time, after the colonoscopy.  Correct?
8     A.   I didn't give them a time of how many days I
9  needed.
10    Q.   But you needed time off after the colonoscopy?
11    A.   Correct.
12    Q.   And they gave you the time off.  Right?
13    A.   That's correct.
14    Q.   Did you need that time off after the
15  colonoscopy because of hemorrhoids?
16    A.   I needed time after the colonoscopy to recover
17  from the colonoscopy that they did.
18    Q.   Was there -- did something go wrong?
19    A.   No.  They told me I needed a few days or
20  weeks.  They didn't tell me exact -- I can't remember
21  exactly how long they told me.
22    Q.   Well, according to the records I reviewed,
23  they told you that you had hemorrhoids.  Correct?
24    A.   Okay.  Yes.  But it could --
25    Q.   Is that right?

Page 47

1     A.   Yes.
2     Q.   Okay.  Was that -- so was that the reason why
3  the colonoscopy inflamed or the hemorrhoids or --
4     A.   The colonoscopy was done to verify that the
5  bleeding could have been anything other than the cancer.
6     Q.   And did they tell you whether the bleeding had
7  anything to do with cancer?
8     A.   After they did the colonoscopy, they noticed
9  hemorrhoids could be the cause.
10    Q.   Okay.  But you were never told that the rectal
11  bleeding that you were experiencing had anything to do
12  with your childhood leukemia?
13    A.   No.  They said they wanted to test me to see
14  what it was, that it's a possibility.
15    Q.   Okay.  And then after they tested you, they
16  found out it was just hemorrhoids?
17    A.   That's correct.
18    Q.   Which is a relief.  Right?
19    A.   Yes.
20    Q.   Okay.  So this will be Exhibit 3.
21         (Exhibit 3 was marked for identification.)
22    Q.   (By Mr. Costales) Okay.  Exhibit 3, these are
23  October emails.  Okay.  So October 1st you sent an email
24  to Lewis Woodell and Leslie Lynch, Medical Situation,
25  October 1, 2020.  Do you see that there?

Page 48

1     A.   I'm sorry?
2     Q.   Do you recognize Exhibit 3?
3     A.   Yes.
4     Q.   Okay.  So this is an email that you sent to
5  Lewis Woodell and Leslie Lynch October 1st.  Correct?
6     A.   That's correct.
7     Q.   Okay.  It says here, I am working and will
8  continue to work.
9          And, by the way, why did you email Lewis and
10  Leslie about this leave issue and not Quiana?
11    A.   At the time that this was happening Lewis was
12  actually her supervisor so I wanted to go to the top.
13  And then Leslie is above Lewis or was above Lewis.
14    Q.   Okay.  And that -- it really should have been
15  an issue for HR.  Correct?
16    A.   Correct.
17    Q.   And Chrysalis, if you need -- while you worked
18  at Chrysalis if you needed, let's say, two days off,
19  would you go to HR, or would you go to Quiana?
20    A.   I would ask --
21    Q.   Or both?
22    A.   Actually, I would ask Quiana.  At the time
23  before Lewis was there I would ask Quiana.
24    Q.   Okay.  And were there times when you would go
25  to HR for any request for any kind of leave of absence?

Page 49

1     A.   No.
2     Q.   Okay.  So this is October 1st, and the next
3  sentence says Tuesday, October 6, in the morning I will
4  be clocking in late.  I have gone to see doctors three
5  times in the last two weeks.  The reason for all these
6  tests is due to a low hemoglobin result that I received
7  from a CBC I had done after having a fever and feeling
8  tired.  Doctors believe I have some sort of internal
9  bleeding; therefore, more tests are needed.
10         Do you see that?
11    A.   Yes.
12    Q.   And then it talks about the colonoscopy.
13         Okay.  And you say All medical information
14  will be sent to HR as well to keep them updated if
15  needed.
16         Do you see that there?
17    A.   Uh-huh.
18    Q.   Okay.  So that sentence there --
19    A.   Yes.
20    Q.   -- where it says Doctors believe I may have
21  some sort of internal bleeding; therefore, more tests
22  and possibly a procedure may be needed.
23         Do you see that there?
24    A.   Yes.
25    Q.   Okay.  So that, that's what we were just

Page 50

1  talking about a few moments ago where they determined
2  that the bleeding was because of hemorrhoids.  Right?
3      A.   That's correct.
4      Q.   Okay.  And the low hemoglobin -- I guess at
5  this time you were concerned because you thought somehow
6  the bleeding had to do with your childhood leukemia?
7      A.   Yes.
8      Q.   But you found out later it was just
9  hemorrhoids?
10     A.   Correct.
11     Q.   Okay.  So the low hemoglobin, what -- how
12 should I put it? -- what were you told about that?  I
13 mean, how did that affect you?
14     A.   They told me, I was informed, that low
15 hemoglobin can result in weakness, being tired, stuff
16 like that.  That's what I was told.
17     Q.   Okay.  Was that solved later on?
18     A.   After a while, yes.
19     Q.   Did they ever figure out what caused low
20 hemoglobin?
21     A.   The blood, the amount of blood that I was
22 losing when going to the restroom.
23     Q.   Oh, I see.  The hemorrhoids have nothing to do
24 with -- maybe you answered this.  But having had
25 leukemia didn't cause hemorrhoids.  Correct?

Page 51

1      A.   We don't know.  We just assumed that -- the
2  doctors just wanted to -- we assumed that it could have
3  been that.  That's why we went for procedures.
4      Q.   Okay.  So you sent that to Lewis and Leslie
5  early in the morning, 8:52.  And then you got a
6  response, it's the next page, from, you got a response
7  from Lewis and then also Jennifer Blue.  Correct?
8      A.   I got one from Lewis and then Jennifer Blue,
9  yes.
10     Q.   Okay.  And then she said in her October 2
11 email Please forward all medical information to my
12 attention.  Thank you.
13          Do you see that there?
14     A.   Yes.
15     Q.   Okay.  Did you ever -- what medical
16 information did you ever send to Chrysalis?
17     A.   My lab work, I believe.  I don't have records
18 of that.  Well, with me right now.
19     Q.   Is that the lab work that you provided in
20 discovery?
21     A.   Correct.
22     Q.   What did that lab work show?  Like, why did
23 you give it to her?
24     A.   Low blood counts.
25     Q.   Okay.  But the lab work didn't show that you

Page 52

1  had had childhood -- well, did that lab work that you
2  sent to them show anything about leukemia?
3      A.   No, I don't believe so.
4      Q.   Okay.  This will be Exhibit 4.
5          (Exhibit 4 was marked for identification.)
6      Q.   (By Mr. Costales) Take a look at Exhibit 4 and
7  let me know if you recognize it.
8      A.   Yes.
9      Q.   Okay.  What is Exhibit 4?
10     A.   It's one of the laptops that they sent, that
11 they gave me that was basically falling apart.
12     Q.   Okay.  That was -- did they replace it?
13     A.   No.
14     Q.   Did you -- do you know what the Family and
15 Medical Leave Act is?
16     A.   No.
17     Q.   Did you ever exhaust all your PTO or sick time
18 at Chrysalis?
19     A.   No.
20     Q.   Did you ever -- were you ever apprehensive
21 about whether you would have a job when you returned
22 from an absence at Chrysalis?  I mean, you didn't -- you
23 never thought that you would be fired after you took off
24 for a medical appointment or anything.  Correct?
25     A.   No.

Page 53

1      Q.   When you worked at Chrysalis, what hours did
2  you work?
3      A.   Nine to five.
4      Q.   And if you had trouble logging into the
5  computer system while you worked at Chrysalis, what
6  would you do?
7      A.   We would try to log on in the morning when our
8  shift would start.  Once it wasn't working or we found
9  out it wasn't working, we would contact our supervisor,
10 at that time being Quiana.
11     Q.   And how would you contact her?
12     A.   Email.
13     Q.   Okay.  Take me through the log-in process when
14 you worked at Chrysalis Health remotely.
15     A.   It was basically jump on eCR -- first send an
16 email to Quiana saying that I'm clocking in so she had
17 it for her records, get on eCR so that it recognized our
18 clock-in, then we would open whatever document Quiana
19 would send us to start working on.
20     Q.   What did you do for Chrysalis Health?
21     A.   I started with data input.
22     Q.   And what was the last job that you had?
23     A.   With them?
24     Q.   Yes.
25     A.   Billing.

Page 74

1    A.   These look like a response to my attorney's
2 questions.
3    Q.   Okay.
4    A.   So this looks like questions being asked by
5 another attorney.
6    Q.   Yeah.  We sent --
7    A.   So.
8    Q.   -- what's called "interrogatories," which are
9 like written questions to the person that --
10   A.   Okay.
11   Q.   -- sued Chrysalis, you, and then in turn your
12 attorney sent us written questions and requests for
13 documents, and we responded to that.
14        All right.  So in here -- so would you -- do
15 you agree that you prepared what's at Exhibit 7 with the
16 help of your attorney, or somebody from his office?
17   A.   I was asked to fill out questions but I wasn't
18 guided through them.
19   Q.   Okay.
20   A.   If that's what the question you are asking is.
21   Q.   Okay.  But was there anything -- do you recall
22 whether there is any question in here that you did not
23 understand?
24   A.   I mean, I would have to go through this whole
25 list again, if you want, to see the questions.

Page 75

1    Q.   Well, let's take it one by one.
2    A.   Yeah, sure.
3    Q.   Okay.  The first one asks for, basically,
4 witnesses, you know, who do you think has information
5 relevant to the lawsuit.
6         And there's a list of people there, and I
7 wanted to ask you about Alex Blanco.  Who is Alex
8 Blanco?
9    A.   Alex Blanco is their IT specialist and he is
10 related to one of the owners of the company.
11   Q.   And what would he know -- it says here, is
12 aware of emails that were sent.  Do you know what that
13 means?
14   A.   Yeah.  He has -- he should have access to my
15 computer in which my emails were sent back and forth
16 between me and Quiana.
17   Q.   The next one is Dr. Paola Cintron Villa.
18 Villa, V-i-l-l-a, Cintron is C-i-n-t-r-o-n, Paola is
19 P-a-o-l-a.
20        It says here Dr. Cintron has information
21 relevant to your diagnosis forming the basis of time off
22 from work.  Do you see that there?
23   A.   Yes.
24   Q.   Do you know what information she has that
25 would be helpful to this lawsuit?

Page 76

1    A.   She's the one that would be able to tell you
2 about my low blood count, my labs.
3    Q.   The low hemoglobin?
4    A.   That is correct.
5    Q.   Which was later determined not to have
6 anything to do with cancer.
7    A.   Correct.
8    Q.   Okay.  Let's see here.  Do you know what you
9 are seeking in this lawsuit?
10   A.   Compensation.
11   Q.   Do you know how much?
12   A.   The exact I -- the exact number, I'm not sure.
13 I believe it's 30,000.
14   Q.   Okay.  Now, in the answer there it says, on
15 the bottom, the last sentence on -- this is the second
16 page, it says He was out of work for 43 weeks.  Do you
17 see that there?
18   A.   Uh-huh.
19   Q.   Or, actually, before that it says that you
20 finally found employment at the beginning of October
21 2021.  Right?
22   A.   Okay.
23   Q.   But that's not true.  Right?
24   A.   I have employment by -- no.  That would
25 be . . .

Page 77

1    Q.   March of 2021 at least.
2    A.   Well, this is March 29, 2021, with Leeds,
3 which means the October 2021 would be Tiffany's.
4    Q.   Right.  But -- how long did you work for
5 Leeds?
6    A.   A few months.  Maybe a month.
7    Q.   One month.  Okay.  So the text message that we
8 saw that's at Exhibit 6, that was March 29, 2021.
9 Right?
10   A.   Correct.
11   Q.   So that means that you were, you started
12 working for Leeds in about February of 2021?
13   A.   Late February.
14   Q.   So where it says there that you finally found
15 employment at the beginning of October 2021, that's not
16 correct because you had that job at Leeds?
17   A.   I had that job at Leeds until March 29th.
18   Q.   Right.
19   A.   October comes after March, so there was time
20 after Leeds where I had no job.
21   Q.   Now, the next entry says Mr. Guarnizo's
22 insurance at Chrysalis covers medical expenses for his
23 epilepsy due to chemotherapy.
24        Do you see that on the next page?
25   A.   Yes.

Page 78

1     Q.   But isn't it true that your doctors don't
2  really know whether your epilepsy was due to
3  chemotherapy?
4     A.   They still treat it as if it was due to
5  chemotherapy because the calcification was due to the
6  chemotherapy.
7     Q.   Do you have any records that show that, that
8  that's a conclusion that the doctors came up with?
9     A.   You would have to get it from the doctors.  I
10 don't have that.
11    Q.   What doctor?
12    A.   You can get that possibly from Cintron,
13 Dr. Paola Cintron who does the labs, covers labs.
14    Q.   How else does this calcification affect you?
15    A.   Besides the epilepsy?
16    Q.   Yes.
17    A.   Nothing.  It's just the epilepsy.
18    Q.   Have you ever filed a workman's comp claim?
19    A.   Workers' comp?  No.
20    Q.   According to the answer to question 16, it's
21 about four or five pages in, you started working at
22 Mount Sinai in August 2021.  Do you see that there?
23    A.   Uh-huh.
24    Q.   You have to say yes.
25    A.   Sorry.  Yes.

Page 79

1     Q.   Okay.  All right.  So then the answer to the
2  third question is not correct where it says that you
3  finally found employment in the beginning of October
4  2021 because you had had that job in August.  Right?
5     A.   Yes.
6     Q.   Okay.
7     A.   I started Tiffany's in October 4th.
8     Q.   Right.  Your current job.
9     A.   Correct.
10    Q.   Well, actually, no, it's Ralph Lauren, I
11 guess.
12    A.   Well --
13    Q.   It's the same company, I guess?
14    A.   No.
15    Q.   No?
16    A.   It's not.
17    Q.   Oh, I thought you -- okay.  So you quit
18 Tiffany and went to Ralph Lauren?
19    A.   Because I was given a better opportunity.
20    Q.   Okay.  I thought it was an internal thing or
21 something.
22         In the three-month period before your
23 termination, I mean before December 2020, let's say -- well,
24 let's make it four months, I guess.
25         From August to December 2020 were you having

Page 80

1  any type of health issues, other than the low hemoglobin
2  and the bleeding?
3     A.   No.  Just the consistent medication that I
4  need for my epilepsy.
5     Q.   Okay.  Was that -- just -- I'm sorry, I missed
6  a word.
7     A.   That's just epilepsy, so it's a continuous
8  medication need.
9     Q.   Okay.  But between August 2020 and December
10 2020 you don't recall that you had any illness that
11 caused you to leave, to miss work, other than the low
12 hemoglobin and the bleeding that we talked about?
13    A.   No.
14    Q.   Okay.  I want to go through some previous
15 write-ups that you had.
16         (Exhibit 8 was marked for identification.)
17    Q.   (By Mr. Costales) Okay.  Taking a look at
18 Exhibit 8, Mr. Guarnizo.  Do you recognize the write-ups
19 that are Exhibit 8?
20    A.   I can read them.  They are old, but yeah.
21    Q.   I'm not going to spend a tremendous amount of
22 time on these, but on the first one you were written up
23 in 2017.  You can read it.
24         So this has to -- you were put on a
25 performance improvement plan back then.  Do you recall

Page 81

1  anything about this write-up?
2     A.   I can read it.  I don't recall it.
3     Q.   Was there a time that you were a data
4  specialist and then you became a billing specialist?
5     A.   I started as data.
6     Q.   Why did you go from data to billing?
7     A.   I asked for more money and I was actually,
8  they actually offered me the billing specialist so that
9  I could receive more money.
10    Q.   Okay.  On the second page, this is August 3 of
11 2017, the supervisor is accusing you of dishonesty.  Do
12 you remember what happened with that?
13    A.   No, I don't recall.
14    Q.   You can read it and let me know if it
15 refreshes your recollection.
16    A.   Okay.  This was basically a follow-up of what
17 somebody else had already done, from what I understand
18 here.  It was just a review of it.
19         MR. CUMMINGS:  I'm sorry, what was the
20 question?  What was the pending question?
21         THE WITNESS:  The reason for dishonesty.
22    Q.   (By Mr. Costales) Yeah.  Do you know --
23         MR. CUMMINGS:  You can let him . . .
24    Q.   (By Mr. Costales) Do you recall what was
25 discussed about alleged dishonesty?

Page 82

1     A.   Only what it says, what it says here.  I mean,
2  this is back in 2017.
3     Q.   Okay.  You don't remember anything apart from
4  what is being stated there?
5     A.   No.
6     Q.   And Chrysalis would give you performance
7  improvement plans and then you would complete those.
8  Correct?
9     A.   That's right.
10    Q.   Okay.  On the next one, which is -- there's
11 some page numbers on the lower left.  The next one is
12 270 that I want to ask about.  Well, do you recall
13 receiving the one that's at the second page, August
14 2017?
15    A.   My signature is on it.
16    Q.   The one, the signature that's 8/10/2017?
17    A.   That's right.
18    Q.   Okay.  On the next page your signature is
19 there, it's marked 000271, the little tiny numbers on
20 the left.
21    A.   Uh-huh, uh-huh.
22    Q.   Okay.  So this was a performance improvement
23 plan in August 2017.  Correct?
24    A.   Yes.
25    Q.   The next page has your signature on it, 272.

Page 83

1     A.   Uh-huh.  Yes.
2     Q.   Okay.  The next page, was that -- I guess it's
3  in reverse chronological order.  So in April 2017 you
4  were also written up.  That's your signature there at
5  Bates stamp 273?
6     A.   Yes.
7     Q.   Okay.  The next page, that's your signature
8  there in 274?
9     A.   Yes.
10    Q.   Okay.  This is employee meeting that's at 275
11 and 276.  Do you see that there?
12    A.   I do.
13    Q.   That's your signature at the end?
14    A.   I don't see the signature on 275.
15    Q.   Look at the next page.
16    A.   276.  Yes, that's my signature.
17    Q.   Okay.  So was this an employee meeting with
18 just you and -- do you remember this employee meeting
19 with Quiana?
20    A.   This is 2017.  I mean, this one says 2016,
21 even older, so no.
22    Q.   Okay.
23    A.   Only what's written here.
24    Q.   Right.  You don't remember if this was, like,
25 part of a group meeting or one-on-one or anything?

Page 84

1     A.   Correct.
2     Q.   Okay.  Okay.  And then that's your -- December
3  29, 2016 is at 277, and your signature is at 278.
4  Right?
5     A.   That is correct.
6     Q.   Okay.  And then the next one, the last one is
7  in 2016, 11/1/2016.  This is the write-up for watching
8  movies on the cell phone.  Do you see that there?
9     A.   Yep.
10    Q.   Is this the only time you were written up for
11 watching movies on your cell phone?
12    A.   Yes.
13    Q.   Did you correct the problem -- was there a
14 problem at that time?
15    A.   Yeah.
16         MR. CUMMINGS:  Objection to the form.
17    Q.   (By Mr. Costales) Go ahead.
18    A.   Yes, there was.
19    Q.   And did you correct it?
20    A.   Yes.
21    Q.   Okay.  Is there anybody at Chrysalis who you
22 think received better treatment than you?
23    A.   No.  Everybody was treated the same.
24         MR. COSTALES:  We have been going a couple of
25 hours, so I don't know that I have -- I'm not going to

Page 85

1  have that much more, I think, so let's take a break for
2  like 10 minutes.
3         THE WITNESS:  Okay.
4         MR. COSTALES:  Unless somebody needs more
5  time.
6         THE VIDEOGRAPHER:  We're off the record.  The
7  time is 11:56.
8         (Recess taken.)
9         THE VIDEOGRAPHER:  Back on the record.  The
10 time is 12:15 p.m.
11        MR. CUMMINGS:  This is Exhibit 9.
12        MR. COSTALES:  Yeah.
13        (Exhibit 9 was marked for identification.)
14    Q.   (By Mr. Costales) Okay.  Mr. Guarnizo, take a
15 look at Exhibit 9.  On the second page is that your
16 signature there?
17    A.   Yes.
18    Q.   Okay.  And on the next page Employee
19 Misconduct in the Workplace, is that your signature
20 there?  Which is on Bates stamped 000070.
21    A.   Yes.
22    Q.   Okay.  Do you know who made the decision to
23 terminate you?
24    A.   I do not.  Not the specific person.
25    Q.   Do you know if there was more than one person

Page 90

```
 1  point?
 2      A.   After requesting it.
 3      Q.   After what?
 4      A.   That is correct.  After requesting it.
 5      Q.   On December 3.  Right?
 6      A.   Yes.
 7      Q.   Now, do you know who created this document?
 8      A.   I do not.
 9      Q.   Do you know where this data came from in this
10  document?
11      A.   I do not.
12      Q.   Can you -- do you see your name anywhere on
13  this document?
14      A.   I do not.
15      Q.   Does this look like a document that was
16  generated by the eCR system?
17      A.   No, it does not.
18      Q.   Do you know who highlighted the entries at the
19  end on page 265?
20      A.   I do not.
21      Q.   Can you say that this document is a valid
22  reporting of your time entries at Chrysalis for the
23  dates that are mentioned?
24      A.   No.
25      Q.   And can you say that these are in fact your
```

Page 91

```
 1  time entries?
 2      A.   No.
 3      Q.   All right.  Mr. Costales previously showed you
 4  Exhibit 8.
 5      A.   Yes.
 6      Q.   Okay.  And Exhibit 8 is a packet of
 7  documentations of supervision and documentations of
 8  discussion going back to 2016 and 2017.  Correct?
 9      A.   Correct.
10      Q.   When you were in the meeting when you got
11  fired on December 2, 2020, did Quiana Ewing mention any
12  of these documents to you as a reason for why you were
13  being fired?
14      A.   No.
15      Q.   Did Lewis Woodell bring up any of these
16  documents in Exhibit 8 as a reason for why you were
17  being fired?
18      A.   No.
19      Q.   Did Jennifer Blue bring up any of these
20  documents as a reason for why you were being fired?
21      A.   No.
22      Q.   Moving over to Exhibit 3, at Exhibit 3 we see
23  an email that you wrote on October 1, 2020.  Right?
24      A.   Yes.
25      Q.   And in this email you are explaining to Lewis
```

Page 92

```
 1  Woodell and Leslie Lynch that you recently had a low
 2  hemoglobin result?
 3      A.   Yes.
 4      Q.   And that your doctors believed that you may
 5  have some sort of internal bleeding?
 6      A.   Correct.
 7      Q.   And then we can see there's a sentence there
 8  that starts with therefore, it says Therefore more tests
 9  and a possible medical/surgical procedure might occur in
10  the months ahead.  I will be having an endoscopy and
11  colonoscopy procedure done soon as well.
12           Right?
13      A.   Yes.
14      Q.   Are you letting Chrysalis know at this point
15  that you may have to take time off in the future?
16      A.   Yes.
17           MR. COSTALES:  Object to the form.
18      Q.   (By Mr. Cummings) And at the time you did not
19  know what was causing your internal bleeding when you
20  wrote this email.  Right?
21      A.   Correct.
22      Q.   When you wrote this email did anybody from
23  Chrysalis respond to you about the Family and Medical
24  Leave Act?
25      A.   No.
```

Page 93

```
 1      Q.   Did anybody give you written notice that you
 2  could take Family and Medical Leave Act leave?
 3      A.   No.
 4      Q.   Did you feel that your need to take time off
 5  for your serious health condition at the time was in any
 6  way related to your firing?
 7           MR. COSTALES:  Objection to the form.
 8      A.   I am not sure.  It could be.
 9      Q.   (By Mr. Cummings) Moving on, Mr. Costales
10  asked you about the employment that you had after you
11  left Chrysalis.  Correct?
12      A.   Yes.
13      Q.   Remember he asked you a series of questions?
14           And, basically, it seems like the impression
15  that one could get is that you only mentioned that you
16  started working in October of 2021.  Is that fair to
17  say?
18      A.   Yes.
19      Q.   All right.  Now, before you started your job
20  in October 2021 -- which was where?
21      A.   On October 1st -- I mean, October 4 was in
22  Tiffany's.
23      Q.   Tiffany's, right.  How long did you hold that
24  job at Tiffany's?
25      A.   I was at Tiffany's for a year and a half.
```

Page 110

```
 1               CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF MIAMI-DADE
 5
 6         I, Jennifer L. Bermudez, Registered
 7   Professional Reporter, Notary Public, State of Florida,
 8   certify that CHRISTOPHER GUARNIZO personally appeared
 9   before me on the 7th day of March, 2023, and was duly
10   sworn.
11         Signed this 20th day of March, 2023.
12
13
14
                   Notary Public, State of Florida
15                 Commission No.: GG 350029
                   Commission Expires: 9/13/23
16
17
18
19
20
21
22
23
24
25
```

Page 111

```
 1               CERTIFICATE OF REPORTER
 2
     STATE OF FLORIDA
 3
     COUNTY OF MIAMI-DADE
 4
 5         I, Jennifer L. Bermudez, Registered
 6   Professional Reporter, certify that I was authorized to
 7   and did stenographically report the deposition of
 8   CHRISTOPHER GUARNIZO, pages 1 through 109; that a review
 9   of the transcript was requested; and that the transcript
10   is a true record of my stenographic notes.
11
12         I further certify that I am not a relative,
13   employee, attorney, or counsel of any parties, nor am I
14   a relative or employee of any of the parties' attorneys
15   or counsel connected with the action, nor am I
16   financially interested in the action.
17
18   Dated this 20th day of March, 2023.
19
20
21         Jennifer L. Bermudez, RPR
           Registered Professional Reporter
22
23
24
25
```

Page 112

```
 1          WITNESS NOTIFICATION LETTER
 2
     March 20, 2023
 3
 4   CHRISTOPHER GUARNIZO
     c/o TOUSSAINT M. CUMMINGS, ESQUIRE
 5   FAIRLAW FIRM
     135 San Lorenzo Avenue
 6   Suite 770
     Coral Gables, Florida 33146
 7   305-230-4884
     toussaint@fairlawattorney.com
 8
 9
     In Re:  Christopher Guarnizo
10           v. The Chrysalis Center, Inc.
             Deposition, taken on March 7, 2023
11           U.S. Legal Support Job No. 6334462-001
12
     The transcript of the above proceeding is now available
13   for your review.
14   Please call 305-373-8404 to schedule an appointment
     between the hours of 9:00 a.m. and 4:00 p.m., Monday
15   through Friday, at U.S. Legal Support office located
     nearest you.
16
     Please complete your review within 30 days.
17
     Sincerely,
18
19   Jennifer L. Bermudez, RPR
     U.S. Legal Support, Inc.
20
21   cc via transcript:
     Gary A. Costales, Esquire
22
23
24
25
```

Page 113

```
 1                  ERRATA SHEET
 2         DO NOT WRITE ON THE TRANSCRIPT
 3         ENTER CHANGES ON THIS PAGE
 4         IN RE: Christopher Guarnizo
              v. The Chrysalis Center, Inc.
 5            CHRISTOPHER GUARNIZO
                 March 7, 2023
 6         U.S. Legal Job No. 6334462-001
 7   Page No.    Line No.        Change      Reason
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
     Under penalties of perjury, I declare that I have read
23   the foregoing document and that the facts stated in it
     are true.
24
     _____        _____
25   Date                    Christopher Guarnizo
```