CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 022-CV-60710

CHRISTOPHER GUARNIZO,

  Plaintiff,

vs.

THE CHRYSALIS CENTER, INC,

  Defendant.
_____/

DEPOSITION OF QUIANA EWING

TAKEN ON BEHALF OF THE PLAINTIFF

MARCH 6, 2023
10:05 A.M. TO 3:02 P.M.

ALL PARTIES APPEARED REMOTELY
PURSUANT TO
FLORIDA SUPREME COURT ORDER AOSC20-23

REPORTED BY:
DLONDRA GOODMAN, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA



877-291-3376
www.ucrinc.com

## CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
### Ewing, Quiana on 03/06/2023      Pages 10..13

**Page 10**

1   Q   Is that's your cellphone number?
2   A   That's correct.
3   Q   All right. Where do you currently work?
4   A   Chrysalis Health.
5   Q   And how long have you worked for Chrysalis?
6   A   I believe this year will be my eighth year.
7   Q   When you first started working for Chrysalis,
8 which job did you have?
9   A   A billing specialist.
10   Q   What is your current job position now?
11   A   An AR Specialist.
12   Q   What does AR stand for?
13   A   Accounts Revenue reporting.
14   Q   How long were you a billing specialist?
15   A   Maybe about a year.
16   Q   When did you become an AR specialist?
17   A   A year ago and between I was billing manager.
18   Q   Okay. So, you became AR specialist in 2022?
19   A   Yes.
20   Q   And between -- let me see, did you start
21 working for Chrysalis in 2015?
22   A   I can't remember. I can't remember the year.
23 I just know I'm going on eight years.
24   Q   All right. And I'm writing down everything
25 we're saying so that's why there's these pauses in

**Page 11**

1 between my questions. All right. But you did say that
2 you were a billing manager or I guess what about six
3 years?
4   A   That's correct.
5   Q   When you were a billing specialist, what were
6 your job duties?
7   A   To work the aging reports, rebill claims that
8 had errors or rejections. That's about it.
9   Q   Okay. You said work the aging reports, is it?
10   A   Yes, it's claims that are denied for whatever
11 reason.
12   Q   Okay. And when you say, are you saying aging
13 like A-G-I-N-G?
14   A   A-G-E, yeah, A-G-I-N-G.
15   Q   Oh, okay. Okay. Aging. All right.
16   A   A --
17   Q   So, basically reports that are getting old?
18   A   Yeah, any claims that are old that did not pay
19 right when it went out the door.
20   Q   Understood.
21   A   There are other responsibilities but that's in
22 a nutshell.
23   Q   Okay. And then as the billing specialist
24 manager, what was your -- what were your job
25 responsibilities?

**Page 12**

1   A   Overseeing the billing department and workload
2 on time cards, productivity, accuracy of the
3 productivity, different responsibilities.
4   Q   How many billing specialist managers were
5 there when you were still at that role?
6   A   One, just myself.
7   Q   And how many billing specialists did you have
8 under you when you were working at any particular time?
9   A   I want to say six.
10   Q   And does the billing manager and all that the
11 billing specialists under the billing -- sorry, let me
12 start over. Does the billing manager and all of the
13 specialists that work under her make up the whole
14 billing department?
15   A   No, we had a director.
16   Q   Who is the director?
17   A   Lewis Woodell.
18   Q   Could you please spell -- is that a woman or
19 man?
20   A   It's a male.
21   Q   Okay. Is that L-E-W-I-S?
22   A   Correct.
23   Q   Woodell W-O-O-D-E-L-L?
24   A   Correct.
25   Q   Okay. And the department that you worked in

**Page 13**

1 was called the billing department?
2   A   Yes.
3   Q   Okay. So, Lewis Woodell was the head of the
4 billing department, then you as the billing manager and
5 then whatever billing specialist worked under you?
6   A   That's correct.
7   Q   Okay. And was the billing department part of
8 a larger finance department or was the billing
9 department just a separate department at Chrysalis?
10   A   Yeah, we were separate.
11   Q   What does Chrysalis Health do?
12   A   We provide mental health and substance abuse
13 services to the community.
14   Q   And how does Chrysalis consider its customers
15 or its clients, what do you call them, patients,
16 customers, clients, how are they refer to internally?
17   A   Our clients.
18   Q   How do the clients pay for Chrysalis services?
19   A   We have clients that are -- have insurance and
20 we have clients that pay out-of-pocket. We have clients
21 that are funded by certain companies.
22   Q   Does Chrysalis provide residential treatment
23 to its clients?
24   A   What do you mean by residential?
25   Q   So, this Chrysalis, because you said that

Page 18

1   BY MR. CUMMINGS:
2        Q    You can answer.
3        A    What do you mean side by side, like were our
4   seats side by side, our desk side by side?
5        Q    Very good point.  So, was there ever a time
6   when Christopher was a billing specialist and you were
7   also a billing specialist before you became a manager?
8        A    No.
9        Q    So, once Christopher became a billing
10  specialist, you were always his manager?
11       A    Correct.
12       Q    All right.  And do you remember what year that
13  was now, that you became his manager?
14       A    No.
15       Q    Now, when you first became Christopher's
16  manager, was he working in the office or was he working
17  from home?
18       A    In the office.
19       Q    Before 2020, did Christopher Guarnizo ever
20  worked from home?
21            MR. COSTALES:  Objection, form.
22       A    I --
23  BY MR. CUMMINGS:
24       Q    You can answer.
25       A    I just remember everyone going home during

Page 19

1   COVID.  The beginning of COVID, Christopher went home
2   and I cannot remember the year, I'm sorry, but the
3   beginning of COVID.  He did not work from home before
4   then.
5        Q    Would Christopher have to get your permission
6   if he needed to work from home before COVID?
7        A    No, it would not have been my decision that
8   would have been an executive decision.
9        Q    Okay.  So, who wouldn't have to make that
10  decision to allow Christopher to work from home?
11       A    It -- I'm not sure, I don't believe Lewis was
12  there at the time.  So, if Lewis was not there, as a
13  director, he will have them went to Leslie Lynch, she's
14  the executive that usually make decisions for the
15  billing department.
16       Q    Okay.  For the record, Leslie Lynch is going
17  to be L-E-S-L-I-E and then Lynch L-Y-N-C-H.  Okay.  So,
18  there was a time when Lewis Woodell was not the director
19  of billing?
20       A    Correct, there was a time where we did not
21  have a director just a billing manager.
22       Q    And so, at the time, there was just Deon
23  Pottinger and then there were all the billing
24  specialists that worked under him?
25       A    No, it was -- okay, so it was Deon for a time-

Page 20

1   -
2        Q    Deon.  Okay.
3        A    -- yeah, and the data and billing was under
4   Deon.
5        Q    And at the time there was no executive,
6   meaning, there wasn't Lewis Woodell?
7        A    Yeah, that's correct.
8        Q    All right.  Do you ever remember Christopher
9   Guarnizo ask him to work from home before the pandemic
10  hit?
11       A    No.
12       Q    Is that something that you wouldn't know if
13  Christopher Guarnizo had requested to work from home
14  before the pandemic hit?
15            MR. COSTALES:  Objection, form.
16  BY MR. CUMMINGS:
17       Q    You can answer.
18       A    It's a maybe, you know, maybe he would have
19  asked me and then I would have referred him to the
20  individual that could assist him with this question or
21  maybe he just wouldn't come to me, he would go to
22  someone else, it would -- I can't really say.
23            But the first time it was ever brought to my
24  attention was during COVID.  And that's not because he
25  asked me, it's because I then knew he was going home due

Page 21

1   to -- because of COVID.
2        Q    Okay.  If an employee or a billing specialist
3   needs to work from home, is there a form that they need
4   to fill out or how do they communicate that request?
5        A    If a billing specialist needed to work from
6   home then that could -- a question could be brought to
7   my attention.  And normally, if you needed to work from
8   home, it would be for a day or two.  It will not be for
9   a long period of time.
10       Q    And you mentioned that you knew that
11  Christopher Guarnizo was working from home because of
12  COVID, why is that?
13       A    After the decision was made, I was told that
14  Christopher will be working from home due to COVID
15  precaution.
16       Q    Got it.  Were all billing specialists told to
17  work from home or just Christopher?
18            MR. COSTALES:  Objection, form.
19       A    No.
20  BY MR. CUMMINGS:
21       Q    You can answer it.  So, here's -- I believe
22  that's Mr. Lacasa.  I'm not sure who's making the
23  objections but --
24            MR. COSTALES:  No, it's me.
25            MR. CUMMINGS:  Mr. Costales?

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023                    Pages 22..25

Page 22

1        MR. COSTALES:  Yeah.
2        MR. CUMMINGS:  Okay.  I couldn't see your
3    mouth moving.
4   BY MR. CUMMINGS:
5        Q    But he'll either say, you know, don't answer
6    that question if he does not want to you to answer
7    otherwise, he'll might just say objection to form and
8    you can continue to answer that question, okay Ms.
9    Ewing?
10       A    All right.
11       Q    All right --
12       A    You can --
13       Q    -- no problem.
14       A    I'm sorry.
15       Q    No, that's fine.  I'm sure he prepped you very
16   well.  So, it's not an issue.  But, so I don't have to
17   keep repeating my questions, you can go ahead and just
18   answer the question unless he tells you not to.  But, so
19   my question was, or let me explain what I'm trying to
20   get to.
21            When the general public found out that, you
22   know, COVID was happening, did Chrysalis decide to allow
23   people to work from home and then send out
24   communications to everybody all of the employees or was
25   Christopher himself allowed to work from home and other

Page 23

1    billing specialist weren't?
2        A    Christopher --
3        MR. COSTALES:  Objection, form.
4        A    Christopher himself was allowed to work from
5    home, everyone else were in the office.
6   BY MR. CUMMINGS:
7        Q    Okay.
8        A    And myself.
9        Q    Why was Christopher allowed to work from home?
10       A    I was told that due to health reasons,
11   Christopher requested that he worked from home because
12   of the COVID outbreak and he was granted that and that's
13   all I was told.
14       Q    You remember about what time in 2020 Mr.
15   Guarnizo was allowed to work from home?
16       A    No, I just remember when it was the beginning
17   of the outbreak.
18       Q    Did you have any issues with Christopher
19   working from home?
20       A    No.
21       Q    Did you notice any drop off in Christopher's
22   productivity when he was first allowed to work from
23   home?
24       A    We did not check for productivity at the time
25   when Christopher went home.

Page 24

1        Q    Does that mean that billing specialists were
2    not checked for productivity before the pandemic?
3        A    No, we -- everyone, we're in the office so,
4    you know, everyone worked.  We had to -- I guess, learn
5    or prepare different reports that would later on give us
6    the ability to see what our team was doing because we
7    were based in the office all the time, you know, working
8    from home was something new.  So, no, no one was checked
9    for productivity.
10       Q    As -- let me ask you this -- did you
11   essentially become a billing manager at the same time
12   that Christopher Guarnizo became a billing specialist?
13       A    No, I was a billing manager prior to
14   Christopher, coming on board to the billing department.
15       Q    Before Christopher became a member of the
16   billing department, did you have to do performance
17   evaluations for your billing specialist?
18       A    Yes, end of the year.
19       Q    You're responsible for providing an annual
20   evaluation for each of your billing specialist?
21       A    Yes.
22       Q    And how did you conduct that evaluation?
23       A    In --
24       MR. COSTALES:  Objection, form.
25       -- a computer based evaluation, and you have

Page 25

1    different questions that are asked, and you have to
2    grade them.
3   BY MR. CUMMINGS:
4        Q    Did that evaluation also consist of an in-
5    person interview with the specialist?
6        A    No.
7        Q    After you completed your part on the computer
8    for the evaluation, did that evaluation go directly to
9    the billing specialists or was there some other level of
10   review before it went to the billing specialist?
11       A    There -- it will go to my director, after
12   approve, then the billing specialists are able to view
13   their evaluation.
14       Q    So, you complete an evaluation for a
15   specialist on the computer and then that evaluation goes
16   to your director, correct?
17       A    Yes.
18       Q    Okay.  And at the time the director would have
19   been Lewis Woodell?
20       A    No, we went in and out.  We went through a few
21   directors, so no.
22       Q    Okay.  All right.  But whoever the director
23   was the evaluation had to go to the director?
24       A    That's correct.
25       Q    Okay.  And were there ever instances where

Page 26

1  director disagreed with your evaluation of a specialist?
2     A.   No.
3     Q.   And so generally speaking after the director
4  reviewed the evaluation then the billing specialists had
5  the ability to view it somehow?
6     A.   Yes.
7     Q.   Before the billing specialists view their
8  evaluation, did you have a meeting with the director
9  about each specialist?
10    A.   No.
11    Q.   At some point, did you become aware that Mr.
12 Guarnizo was a cancer survivor?
13    A.   No.
14    Q.   When you learnt that Mr. Guarnizo needed to
15 work from home due to the pandemic or to COVID, did you
16 find out what his specific medical reason was for
17 needing to take off or be working from home?
18    A.   No.
19    Q.   Are you aware of any other Chrysalis employee
20 knew about a particular medical condition that Mr.
21 Guarnizo had that required him to work from home?
22         MR. COSTALES:  Objection, form.
23    A.   No.  No, I'm not aware.
24 BY MR. CUMMINGS:
25    Q.   Who informed you that Mr. Guarnizo will be

Page 27

1  working from home?
2     A.   Leslie Lynch.
3     Q.   And Leslie Lynch is a woman, right?
4     A.   Yes.
5     Q.   Okay.  What did Ms. Lynch tell you in
6  particular about Mr. Guarnizo working from home?
7     A.   That due to health precautions he would like
8  to work from home and she granted it.
9     Q.   Did you have any objection to Mr. Guarnizo
10 working from home?
11    A.   No, I did not.
12    Q.   And you never asked any further besides
13 whatever his health -- about what his health precautions
14 were?
15    A.   No, I did not.
16    Q.   Okay.  At some point later on, in
17 Mr. Guarnizo's working career before he was terminated,
18 did you ever find out that he was a cancer survivor?
19    A.   No.
20    Q.   What was your overall impression of
21 Mr. Guarnizo as a billing specialist?
22    A.   He was, you know, a pretty cool gentleman. He
23 came to work.  You can, you know, see that billing was
24 his -- like that was his first time in a billing
25 department setting.  It wasn't his background.

Page 28

1     A.   But, you know, he -- that's it.  That's really
2  it. He didn't talk much.  But he -- we all got along
3  together and the -- in our department.  And that's it,
4  well, not much just saying.
5     Q.   All right.  And he mentioned, you can tell
6  that that was his first time in that setting as a
7  billing specialist, why did you say that?
8     A.   Oh, because he had a huge, you know, he had a
9  hard time grasping what we did in the billing
10 department.  It was in his background.  So, he had a lot
11 of coaching.
12    Q.   Who provided the coaching to him?
13    A.   It was either myself or one of the billing
14 specialists that were there for a long period of time.
15 We had a lead billing specialist.
16    Q.   Who was it?
17    A.   Her name was Denise.  I cannot remember her
18 last name.  I cannot remember her last name, first name
19 was Denise.
20    Q.   Would you sometimes assign Denise to work with
21 Mr. Guarnizo specially?
22    A.   Yes.
23    Q.   Was Mr. Guarnizo eventually able to catch up
24 and understand what his job duties were?
25    A.   Sometimes.

Page 29

1     Q.   What would you say he was never actually able
2  to fully accomplish as a billing specialist?
3     A.   I cannot pinpoint a certain task being that it
4  was a few years ago, but, you know, he had a few things
5  that he had a hard time completing.
6     Q.   But you can't remember where they were now?
7     A.   I cannot.
8     Q.   Did you ever have any personal problems with
9  Mr. Guarnizo?
10    A.   No.
11    Q.   Do you notice if he ever became friendly with
12 any other Chrysalis employees?
13         MR. COSTALES:  Objection, form.
14    A.   No, I mean, what's friendly?  What's your
15 definition?  Before I answer no, what's the definite --
16 like, you know, he spoke with everyone but.
17 BY MR. CUMMINGS:
18    Q.   Yeah, well, you mentioned that he kind of sort
19 of kept to himself.  But did you notice if he sat with
20 anyone in particular during lunch?  Did you ever hear
21 about him going out with other people outside of the
22 workplace, you know, things like that?
23    A.   No.
24    Q.   Before the pandemic or before Mr. Guarnizo was
25 allowed to work from home due to the pandemic, would you

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 66..69

Page 66

```
 1  your car?
 2      A    Yes.
 3      Q    And as a result, employees could access Paycom
 4  and then log in from their car, right?
 5      A    That's correct.
 6      Q    When did you find out that that was a concern
 7  for Chrysalis?
 8      A    Sometime in the midst of me taking on the role
 9  of Deon and being the billing manager, I had to
10  supervise Paycom.  So, a lot of, I would notice that
11  people would be clocked in for work but not actually at
12  their desk, so.
13      Q    Because you would be in office at the time and
14  see people clocking in but those -- that person was not
15  actually there physically in the office?
16      A    That's correct.
17      Q    Okay.  Did you ever have to speak to Mr.
18  Guarnizo about clocking in early when he was not in the
19  office?
20      A    I'm sorry.  I cannot remember that far back.
21      Q    If you didn't notice that Mr. Guarnizo was
22  clocking in before he came into the office, is that a
23  conversation that you would have had with him?
24      A    Yes, but normally we have a conversation in
25  all in general.  Like you see, we have documentation of
```

Page 68

```
 1      A    Yes.
 2      Q    Was Ms. Singleton terminated because she had
 3  been given prior warnings or was it a first time
 4  infraction for her?
 5      A    I do not remember.
 6      Q    Did you recommend that Ms. Singleton be
 7  terminated or was the standard that she had to be
 8  terminated?
 9      A    No, it was a decision on my part, and I
10  believe I had a director at that time.
11      Q    And you're not sure if that director was
12  Mr.-- okay.  Was Mr. Pottinger ever a director?  He was
13  never a director?
14      A    Deon, she was a director.  Yes.  But she was
15  not the director at the time that Deidre was let go.
16      Q    Okay.  Deon Pottinger is a woman?
17      A    Yes.
18      Q    Okay.  And you don't remember the director
19  that you made the decision with to terminate Deidre
20  Singleton?
21      A    It should have been Erika Watts.
22      Q    Watts.  Okay.  And then Watts is going to be
23  W-A-T-T-S?
24      A    Yes, that's correct.
25      Q    Erica, E-R-C-A -- E-R-I-C-A?
```

Page 67

```
 1  the conversation and then if it became a repetitive
 2  thing, then yes, he would have gotten written up for
 3  those issues.
 4      Q    And in this particular moment, you don't
 5  remember if you wrote Mr. Guarnizo up for clocking in
 6  early when he was not in office?
 7      A    Correct.  I can't remember.
 8      Q    Okay.  Do you remember writing any of your
 9  employees up for that particular misconduct, clocking in
10  before they arrived into the office?
11      A    Yes, I actually had to let someone go because
12  of the issue of clocking in.
13      Q    Do you remember -- oh, I'm sorry --.
14      A    Clocking in and not being on the clock.  Yes.
15      Q    Which employee was that?
16      A    Deidre Singleton, I think that's her name.
17      Q    Do you remember what year that was?
18      A    No, don't remember what year.
19      Q    If you can ballpark, did you have to write out
20  Deidre Singleton for mis -- for clocking in before she
21  came in before the pandemic or after the pandemic?
22      A    Oh, no, this was before the pandemic.
23      Q    And if it was Ms. Singleton that you're
24  referring to, and I remember correctly, was she also
25  terminated for that misconduct?
```

Page 69

```
 1      A    E-R-I -- no, she has a K, E-R-I-K-A, I
 2  believe.
 3      Q    Do you remember how to spell Deidre?
 4      A    No.
 5      Q    Okay.  All right.  So, Ms. Singleton was
 6  definitely terminated for clocking in before she was
 7  supposed to?
 8      A    Clock -- not be -- clocking in and not
 9  actually working.
10      Q    Not actually working.
11      A    That was the issue with the whole Paycom.
12  You're clocking in, you're on the clock, but you are now
13  working.
14      Q    Okay.  And then it says -- sorry, I'm just
15  going to go back to this exhibit.  Exhibit E, the
16  documentation, and discussion that we were looking at --
17      A    Um-hum.
18      Q    Under Paycom, it says, "Employees are to
19  e- mail Jessica Goldstein immediately to add the punch."
20  Who is Jessica Goldstein?
21      A    She was in human resources.  I do not remember
22  her exact title, but she works in the human resources
23  department.
24           So, with that whole issue with e-mailing
25  Jessica, that's only if you are in the -- you're in your
```

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 70..73

Page 70

1  department, you're at your desk and you're unable to
2  access Paycom.
3          So, if you come in and for whatever reason
4  your computer is down or the internet or something, then
5  you were to e-mail Jessica and say, "Hey, Jessica, you
6  know, I'm here at such and such time, but I'm unable to
7  log into Paycom to clock in."
8      Q   Okay.  And so every employee -- let me put it
9  like this.  Every billing specialist was provided with a
10  computer to work at Chrysalis with?
11      A   That's correct.
12      Q   And on that computer is a Paycom application?
13      A   That's correct.
14      Q   And then every employee has their own specific
15  user ID and password to access Paycom?
16      A   That's correct.
17      Q   All right.  Now, under Paycom issues, we see
18  on Exhibit E, it says, "Breaks and clocking in and out."
19  And then it says, "Lunch breaks must be indicated on the
20  time sheets."
21          This time sheet that's been referred to, is
22  that a digital Paycom timesheet or is that a physical
23  timesheet that employees have to fill out?
24      A   That's a digital Paycom timesheet.
25      Q   And so if an employee was going to take one of

Page 71

1  their 15 minute breaks, they have to now go into Paycom
2  and log out, I'm sorry, clock out?
3      A   No, 15-minute --
4      Q   Oh, what happened?  Go ahead.
5      A   -- are not indicated on our timesheets.  In
6  our department, we were able to work during our lunch
7  break.  We can take -- we take our two 15 minutes
8  whenever we want.  But if you didn't want to take a 30
9  minute or an hour, we can eat at our desks.
10          Now, if you wanted to go outside of the
11  facility, outside of Chrysalis grounds, you needed to
12  clock out.
13      Q   For any reason?
14      A   For any reason.  Yes.
15      Q   Even if you're taking a 15-minute break?
16      A   No, I mean -- well, yes, yes, off of Chrysalis
17  grounds, yes.  But I will say that, you know during our
18  15-minute breaks, no one left the property.  You could
19  not take the 15-minute breaks together.
20      Q   Right, you can't make it one 30-minute break?
21      A   Correct.
22      Q   All right.  However, for lunch, lunch was how
23  long?
24      A   Well, it depends.  If you wanted to only stay
25  eight and a half hours, then you will have a 30-minute

Page 72

1  break.  If you want to stay nine hours, you will have an
2  hour break.  If you --
3      Q   And -- sorry, go ahead.
4      A   If you want to leave exactly after your eight
5  hours, then you took your two 15-minute breaks whenever
6  you want it and ate your lunch if you wanted to eat at
7  your desk.
8      Q   Okay.  Understood.  And then as -- and what
9  you mentioned before is here, it says, "Employees may
10  not clock in or out from their cellphones.  All clocking
11  in and out must be in -- from in the office on an
12  authorized Chrysalis computer."
13          Do you know why employees had the ability to
14  clock in and out from their phones if it wasn't
15  authorized?
16      A   Because Paycom is through the internet, all
17  you have to do is type in paycom.com.  And you're able
18  to access Paycom.
19      Q   I see.
20      A   So, that's how they were able to utilize as
21  long as they were on a Chrysalis Wi-Fi.
22      Q   Okay.  Understood it.  Now, let's talk about
23  overtime for a second.
24      A   Um-hum.
25      Q   Could employees work overtime -- well, I guess

Page 73

1  this answers that question.  How often were employees
2  working overtime?
3      A   During special projects only.
4      Q   And that was the only time that overtime would
5  be approved?
6      A   Yeah, special projects, maybe if you're
7  struggling with something and you see that you're taking
8  a longer time than everyone else, if it's approved, then
9  you can work the overtime.
10      Q   What would be considered a special project for
11  a billing specialist?
12      A   Maybe we have a large agent report that we're
13  meaning timely filing, we need the claims to get out the
14  door as soon as possible.  So, all hands on deck and
15  you're able to get overtime for that project.
16      Q   And then moving down where it says, "Cell
17  Phone Use: personal phone calls must be taken
18  outside the current viceroy office."  What is the
19  viceroy office?
20      A   It's like a meeting area.  At that moment, we
21  were all in one large room and we had our sections.  So,
22  if you're on the phone and you're loud, you can be
23  disruptive to the next person, so.
24      Q   Was the 3800 building in Broward called the
25  viceroy office or there was just a floor in that

UNIVERSAL
COURT REPORTING
The Free Video Company

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 110..113

Page 110

1  him as a billing specialist, right?
2      A    That's correct.
3      Q    Okay.  And please just take a second to read
4  over this document and let me know when you're done.
5      A    Okay.
6      Q    Okay.  All right.  Based on what you read
7  here, is there any type of reprimand being given to Mr.
8  Guarnizo in this documentation of supervision?
9      A    No.
10     Q    All right.  Stay tuned for the next document,
11  which is going to be Exhibit J.
12          (Thereupon, Plaintiff's Exhibit J was entered
13          into the record.)
14  BY MR. CUMMINGS:
15     Q    All right.  So, I'm now showing you Exhibit J,
16  which is a counseling disciplinary action from December
17  2nd, 2020.  And at the bottom -- this is a two-page
18  document.  At the bottom of Page 1, do you recognize
19  your signature there?
20     A    Yes.
21     Q    Okay.  And do you recognize any other
22  signatures at the bottom of Page 2 or at -- on Page 2?
23     A    I mean, the signatures, no, just the
24  director's name.
25     Q    All right.  And the director was Lewis

Page 111

1  Woodell?
2      A    Yes.
3      Q    All right.  And then where it says CPEO
4  signature, do you know what CPEO stands for?
5      A    No.
6      Q    Do you recognize the signature next to that
7  line that says CPEO?
8      A    No.
9      Q    All right.  I'm going to let you go ahead and
10  read over this document.  And let me know when you're
11  done and when you need me to scroll up and down.
12     A    Okay.  Okay.
13     Q    All right.  Do you need to read any other part
14  of it or are you good with the part that you read so
15  far?
16     A    No, that's good.  The rest of it is just the
17  signatures.
18     Q    All right.  So, starting again from the top,
19  now we can see that in December of 2020, the position
20  says billing specialists, right?
21     A    That's correct.
22     Q    So, now, Mr. Guarnizo is in the billing
23  department?
24     A    That's correct.
25     Q    And he's now working under you as a billing

Page 112

1  specialist?
2      A    That's correct.
3      Q    Okay.  After -- we see that there's several
4  performance issues that were identified in that box.  We
5  see attendance, misconduct, policy violation,
6  dishonesty, and insubordination.  You filled out this
7  disciplinary action, correct?
8      A    That's correct.
9      Q    Okay.  So, after reviewing this document, does
10  it refresh your memory as to the different types of
11  behavior that Mr. Guarnizo engaged in that led to all
12  these different performance issues?
13     A    Yes.
14     Q    All right.  And let's just start with the
15  first one.  It says attendance, and then dates, see
16  attached.  I don't have anything that was attached to
17  it.
18          Do you remember what it is that you attached
19  to this particular document as far as his attendance?
20     A    It would have been his Paycom timesheets along
21  with the productivity spreadsheet.
22     Q    All right.  So, let me stop right here.  And
23  just -- because when I say that I don't have anything
24  attached to it, I mean, when I got this, there was
25  nothing else literally attached to it.

Page 113

1          But I do have some other documents that may be
2  what you're talking about.  I just don't know.  So, let
3  me -- okay.  Let me show you something else, which I'm
4  going to mark as Exhibit K, but I'm not really sure how
5  to mark it.
6          (Thereupon, Plaintiff's Exhibit K was entered
7          into the record.)
8  BY MR. CUMMINGS:
9      Q    All right.  Can you see the document I'm
10  showing you on your screen now?
11     A    Yes.
12     Q    Do you recognize this document?
13     A    The format, yes.
14     Q    Okay.  What is this?
15     A    This is a spreadsheet that comes out of ECR,
16  which is the electronic health record system.  And it in
17  details shows you when an employee enters the system and
18  every single movement that they're making in the system.
19     Q    Literally like by keystrokes?
20     A    Well, not really keystrokes.  This, if you
21  enter into a client, if you save something into a
22  client, if you view the name, and then go and view the
23  birthday, if you change something and so whatever you're
24  doing inside of that client's account, it's being
25  captured here.

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 118..121

Page 118

1      Q    Okay.
2      A    Yes.
3      Q    Got it.  Okay.  So, let me show you another
4  document that I received which doesn't -- I don't think
5  is really going to help us much because this is how I
6  received it.  But anyway, I'll mark it as an exhibit.
7  I'll make this Exhibit L.
8           (Thereupon, Plaintiff's Exhibit L was entered
9            into the record.)
10 BY MR. CUMMINGS:
11     Q    And I'll refer to it as Chrysalis Center's
12 Bates Stamped 204 going down to 220.  And I'm not sure
13 if this is going to help you because this is how I got
14 it.
15           But just for the record, the very first page
16 of Exhibit L says hours work per day, it's in a gray
17 bar. And then when we move down, we see that there are
18 blue bars that just highlight hours.  But that's all we
19 see.
20           Does this in -- document in any way help you
21 know if this is a Paycom printout?
22     A    This probably would have been a productivity
23 because what I usually do, when I'm going over
24 productivity is calculate the hours that the individual
25 has worked inside of ECR.

Page 119

1      Q    Okay.
2      A    So, based on the data that was coming out of
3  ECR, I'll calculate how many hours were actually worked
4  in ECR.
5      Q    Okay.
6      A    So, if the employee did not complete in a full
7  let's just say, seven and a half hours out of ECR, I
8  should have had an e-mail stating what the employee was
9  working on for that day.  Everything had to -- your
10 entire workday had to be tracked.
11          So, if you did not have seven and a half hours
12 of work out of ECR, I should have had an e-mail stating,
13 "Quiana, I am working on certain -- I'm working on the
14 inside of the Beacon portal.  I will not be working the
15 ECR today."
16          And I will utilize that along with ECR to make
17 up the seven and a half to eight hours.  And I say seven
18 and a half, because we leave 30 minutes to answer e-
19 mails.
20     Q    Okay.  All right.  So -- you said a lot so let
21 me just go back, because we're looking at Exhibit L
22 right now.  You think that this document that we're
23 looking at, Exhibit L, would have been exported from the
24 ECR system?
25     A    Yes.  Well, not exported, I would have added

Page 120

1  those numbers up myself, based on the data from the
2  system.
3      Q    Got it.  So, let me ask you this.
4      A    So, if -- K --
5      Q    Go ahead.
6      A    So, if you go to K and you see 11:30, and you
7  know, you add up all of the hours that was worked from
8  11:30, and then I would put that number that you see in
9  blue.
10     Q    Okay.  Now, when you say 11:30, you mean
11 November 30th, right?
12     A    November 30th.  Exactly.  So --
13     Q    Okay.  Not like 11:30, the time of day?
14     A    Right.
15     Q    Right.  Okay.  Got it.  Okay.  And so let me
16 just go back to Exhibit L really quickly.  Is there --
17 what's missing from this document?  Is there something
18 missing or is this the way it's supposed to look?
19     A    I don't know, maybe the different format that
20 it's saved in because sometimes when you save it in a
21 different format, it just looks weird.  But it should
22 coincide with the Exhibit K.
23          Maybe I just gave it to -- I gave the hours to
24 my director and didn't have the backup with it.  Maybe I
25 put it in a different e-mail, but it could have for sure

Page 121

1  just being the hours.
2      Q    Okay.  So, just again, looking at Exhibit L,
3  and we're on Page, let's say, 2, this one, it just has a
4  blue bar that says three and a half hours.
5           Essentially, what you're really doing here is
6  you're saying on this particular day, Mr. Guarnizo only
7  worked three and a half hours?
8      A    Correct.
9      Q    Okay.  But based on what we're looking at, we
10 just can't tell what day it is because this document
11 necessarily has to be referring to some other document?
12     A    That's correct.
13     Q    Okay.  And it might be referring to the ECR
14 printout from Exhibit K?
15     A    Correct.
16     Q    All right.  You just can't say for sure right
17 now?
18     A    Right.
19     Q    Have you -- did you see the document I'm
20 showing you now as Exhibit L, in preparation for your
21 deposition?
22     A    No.
23     Q    Okay.  Do you know if you created this
24 document, Exhibit L?
25     A    I can't remember for sure.



## CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 122..125

Page 122

1    Q   Got it.  Okay.  I actually didn't mean to come
2  out of the screen share.  So, let me go back.  I'm going
3  to go all the way back to Exhibit J, the disciplinary
4  action report.  Okay.
5       All right.  So, we dealt with attendance.
6  Let's move down to misconduct, falsification of
7  timesheet.  What did Mr. Guarnizo do or how did he
8  falsify a timesheet?
9    A   It would have been Christopher clocking in at
10 a certain time, and not having any activity in any of
11 our systems, or me receiving an e-mail stating that he's
12 working on a special project that would not allow him to
13 be in our system.
14   Q   Okay.  And you previously gave an example,
15 where an employee or a billing specialist could say I'm
16 working in Beacon.  Would that be considered a special
17 project that can't be tracked by Chrysalis?
18   A   That's correct.
19   Q   Okay.  So, what exactly would an employee be
20 working in, in the insurance companies?  Is it like the
21 insurance company's database that can't be tracked by
22 Chrysalis?
23   A   That's correct.
24   Q   Okay.  And does --
25   A   And that's -- sorry.

Page 123

1    Q   Go ahead.
2    A   And I just want to note that, you know, that's
3  a rare occasion.  So, that's why we came up with that
4  rule.
5       You'll rarely be in a system that is not of
6  ECR, because in order to get a client's information, you
7  pretty much have to be in ECR.  You can't remember you
8  know, our client information, so you have to go into ECR
9  to grab that information.
10   Q   Okay.  Got it.  And how do you -- when it
11 comes to the falsification of timesheet, how do you
12 substantiate that the employee did, in fact, falsify
13 their time?
14   MR. COSTALES:  Objection, form.
15   A   We have our own individual logins for Paycom.
16 It's not shared.  And when you log into Paycom, you have
17 to click the clock in or clock out button.
18       So, if you're clocked in, you're supposed to
19 be working for Chrysalis.  If you're clocked out, then
20 you're not supposed to be working.
21       So, being that it was stated Christopher was
22 working at certain hours, and it's no type of
23 productivity to back that, that's what led to the
24 falsification of timesheet.
25   BY MR. CUMMINGS:

Page 124

1    Q   Got it.  So, essentially, what you're doing is
2  you're comparing Paycom to ECR, correct?
3    A   That's correct.
4    Q   Paycom says Christopher Guarnizo is clocked in
5  for a certain amount of time.  But when you look at ECR,
6  you don't see minute to minute data that backs up that
7  he's working at that time.  Is that right?
8    A   ECR or any e-mail, I did -- if I haven't --
9    MR. COSTALES:  Form.
10   A   -- then that will take presence of ECR.
11   BY MR. CUMMINGS:
12   Q   In this particular case, I believe you said
13 October and November, you're having productivity issues.
14 When did you start noticing this problem or when did you
15 start thinking that Mr. Guarnizo was falsifying his
16 time?
17   A   Well, it didn't necessarily --
18   MR. COSTALES:  Objection to form.
19   A   -- begin with Christopher, it was an overall
20 department.  We noticed that our denials were adding.
21 The quantity was becoming more than usual.  So, we were
22 just starting to work from home.
23       So, we put in place of how to track
24 productivity and so forth.  And that's what led to me
25 and the team lead going over productivity.

Page 125

1       And this is not just a onetime thing.  This is
2  something that was done, you know, often to check to see
3  what everyone was actually doing throughout their day.
4  BY MR. CUMMINGS:
5    Q   Were the billing specialists made aware that
6  their productivity was being watched because of the drop
7  off?
8    A   Yes, that's correct.
9    Q   How are the billing specialist made aware of
10 that?
11   A   We've had meetings and verbal discussions.
12   Q   Did this problem become significantly -- name
13 of that word -- did it become noticeable the problem of
14 the claims stacking up or the denial stacking up during
15 the pandemic when people were working from home?
16   MR. COSTALES:  Objection to form.
17   A   Again, it wasn't more so tracked because we
18 were all in the office, but it was noticeable that we
19 were maintaining a larger denial report than usual.
20 BY MR. CUMMINGS:
21   Q   When would you say you started noticing
22 Mr. Guarnizo's productivity falling off?
23   A   I remember having a conversation with him
24 prior to this December's date.  I cannot remember the
25 actual date.  But I do recall having a conversation

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 126..129

Page 126

```
1   regarding it.
2       Q    Okay.  And at the time that you had the
3   conversation with him, he was working from home?
4       A    Yes.
5       Q    How did you have the conversation with
6   Mr. Guarnizo?
7       A    Via Teams.
8       Q    Was anybody else present on Teams besides you
9   and Mr. Guarnizo when you had the conversation with him
10  about his productivity?
11      A    I can't remember.
12      Q    How soon after -- let me start over.  You
13  previously mentioned that Mr. Guarnizo started working
14  from home one to two months before the rest of the
15  billing specialist?
16      A    Yes.
17      Q    How soon after he started working from home
18  did you start to notice his productivity falling off?
19      A    It was not soon after.  It was --
20      Q    Not soon after?  Okay.
21      A    No, it wasn't.
22      Q    All right.  If you had to guess a number of
23  months, like how many months would you say did you start
24  to notice his productivity since he -- after he started
25  working from home?
```

Page 127

```
1       A    Again, it wasn't just --
2       MR. COSTALES:  Objection to form.
3       A    It wasn't just Christopher.  So, I can't say
4   that it was just Christopher's productivity that started
5   to drop.  It was an overall billing department issue.
6   BY MR. CUMMINGS:
7       Q    And when you say it was the overall billing
8   department issue, did you notice productivity for
9   denials falling off when Mr. Guarnizo was working from
10  home, but other billing specialists were still in the
11  office?
12      A    We weren't monitoring at that time.
13      Q    Weren't monitoring.  And you weren't
14  monitoring because the volume of the claims denials were
15  not a problem for the billing department at that time.
16  Is that right?
17      A    That's correct.
18      Q    All right.  And are we talking about the time
19  period early 2020?
20      A    The beginning of the pandemic, I cannot
21  remember the dates, but the beginning of pandemic.
22      Q    Whose idea was it to start tracking
23  productivity through ECR and Paycom?
24      A    Our director.  He had fresh eyes.  He was new
25  to the department.
```

Page 128

```
1       Q    Who was that director?
2       A    Lewis Woodell.
3       Q    Do you know of Mr. Woodell worked for
4   Chrysalis before he came in as the director of billing?
5       A    No, he didn't.
6       Q    Did Mr. Woodell tell you to watch
7   Christopher's productivity in particular?
8       A    No.
9       Q    When you had the meeting with Christopher on
10  Teams to alert him that his productivity was being
11  checked, what did he say at that time?
12      A    I can't remember the conversation.  There was
13  a meeting with all of the staff.  Not just Christopher.
14  It was a verbal meeting amongst everyone.
15      Q    Okay.  So, you didn't have a particularly --
16  it wasn't just a one on one with you and Christopher
17  Guarnizo to let him know that his productivity was
18  falling off, there was a Teams meeting with the whole
19  billing department?
20      A    I cannot recall if it was just Christopher and
21  I, or the entire department because at that time,
22  everyone was spoken to regarding productivity.  If it
23  was individual or not, I cannot recall.
24      Q    Is it possible that there could have been a
25  group Teams meeting with all of the billing specialists?
```

Page 129

```
1       A    Yeah.
2       Q    And then separately, you had a one on one with
3   Mr. Guarnizo?
4       A    I'm sorry for answering too early.
5       Q    No problem.  Go ahead.
6       A    No.  No, it would have been with everyone, or
7   just each employee and myself.  Just I didn't --
8       Q    Okay.  Is there any -- how did the employees
9   know that there was going to be the Teams meeting,
10  whether it was group or individual?
11      MR. COSTALES:  Objection, form.
12      A    Well, we have calendar invites.  So, you would
13  have received the calendar invite.
14  BY MR. CUMMINGS:
15      Q    Okay.  Does that calendar invite go through an
16  e-mail address also?
17      A    Yes.
18      Q    Okay.  The next performance issue you
19  mentioned was a policy violation, timing
20  attendance/professional or, you know, timing
21  professional standards.
22           Is there any new information that we haven't
23  talked about that falls under policy violation or is it
24  all under the attendance and misconduct because of the
25  falsification of timesheet?
```

Page 130

1    A    It's all under the falsification of the
2 timesheet.
3    Q    Okay.  And when you refer to a policy
4 violation, is there some particular Chrysalis policy
5 that you are writing Mr. Guarnizo up under?
6    A    Yes, that's correct.
7    Q    Okay.  Is that policy violation found in an
8 employee handbook?
9    A    Yes.
10    Q    Do you have to reference the employee handbook
11 before you write up your disciplinary actions for
12 billing specialist?
13        MR. COSTALES:  Objection to form.
14    A    I don't have to.  No.
15 BY MR. CUMMINGS:
16    Q    And is that because you're already familiar
17 with the policy that has been violated?
18    A    That's correct.
19    Q    Moving over to that next column, where it says
20 dishonesty, what is the dishonesty that Mr. Guarnizo
21 engaged in?
22    A    Well, basically stating that he was working
23 and he wasn't.
24    Q    And then moving down to insubordination, what
25 was the insubordination?

Page 131

1    A    Basically, the same things.  States that he
2 was put on his time sheet he was working and there was
3 no work at all.
4    Q    All right.  Moving down to the statement, did
5 you write that statement yourself?
6    A    Yes.
7    Q    It says that Lewis Woodell, Quiana Ewing, and
8 Jennifer Blue met with Mr. Guarnizo to address time and
9 attendance, productivity during October, November, and
10 professional standards.  What meeting is being referred
11 to here in the statement?
12    A    This is the actual day that Christopher was
13 terminated.
14    Q    Which would've been December 2nd, 2020?
15    A    Correct.
16    Q    And -- excuse me.  What format did this
17 meeting take place on?
18    A    Teams.  It may have been Zoom.
19    Q    But either way it was a remote video
20 conference?
21    A    Correct.
22    Q    Did Mr. Guarnizo have any way of knowing that
23 he was going to be terminated before this meeting took
24 place on December 2nd, 2020?
25        MR. COSTALES:  Objection, form.

Page 132

1 BY MR. CUMMINGS:
2    A    No.
3    Q    And why would Mr. Guarnizo not have known that
4 he was going to be terminated on December 2nd,
5 2020?
6        MR. COSTALES:  Objection, form.
7 BY MR. CUMMINGS:
8    A    I mean, the only way he would've known if
9 someone would have, you know, told him that prior to the
10 meeting.  And it was only myself, Lewis, and Jennifer
11 that knew that information, so I don't know how he
12 would've known.
13    Q    Did Mr. Guarnizo -- excuse me.  Did
14 Mr. Guarnizo have an opportunity to correct the problems
15 that you identified here in this counseling action
16 before this December 2nd, 2020 meeting?
17        MR. COSTALES:  Objection, form.
18    A    Yes.
19 BY MR. CUMMINGS:
20    Q    You can answer, but let me just re-ask the
21 question.  I understand that the objection is standing.
22 But did Mr. Guarnizo have the opportunity to correct the
23 performance issues before the December 2nd, 2020 meeting
24 and termination?
25    A    Yes.  We spoke about it in a verbal discussion

Page 133

1 regarding time and attendance.
2    Q    And that's the meeting that we've been talking
3 about before that was either a group meeting with all of
4 the billing specialist team, or it was one- on-one with
5 him in particular, right?
6    A    That's correct.
7    Q    Okay.  You just don't remember what -- which
8 one it was, whether it was group or one-on-one?
9    A    That's correct.
10    Q    Would that have been the only other time that
11 Mr. Guarnizo would've been aware of his productivity
12 issues?
13        MR. COSTALES:  Objection, form.
14    A    No.
15 BY MR. CUMMINGS:
16    Q    Right.  Yeah.  Let me re-ask that.  Let me re-
17 ask the question.  The meeting that we're referring to
18 before December 2nd, would that have been his only
19 opportunity to know that his Chrysalis supervisors were
20 concerned about his productivity?
21    A    No.
22    Q    Okay.  How else would Mr. Guarnizo have known
23 that his Chrysalis supervisors were concerned about his
24 productivity before December 2nd?
25    A    We have meetings just about every week, and

UNIVERSAL
COURT REPORTING
THE FREE VIDEO COMPANY

877-291-3376
www.ucrinc.com

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 134..137

Page 134

1  certain issues is brought up to the entire staff.  You
2  don't necessarily have to be singled out, but you're
3  made aware that your productivity is being monitored and
4  everyone needed to pick up the pace that they're working
5  at.
6          So, everyone was made aware that they were
7  being monitored and they had to, you know, produce the
8  work that they should have been producing in an eight
9  hour workday.
10     Q    Those weekly meetings, they took place over
11  Teams?
12     A    That's correct.
13     Q    What day did they usually happen?
14     A    I can't remember back then if it was the same
15  day as it is now.  I'm -- I can't remember.
16     Q    Were all of the billing specialists required
17  to be in that meeting?
18     A    Yes.
19     Q    The weekly meeting?
20     A    Yes.
21     Q    Do you remember if Mr. Guarnizo was present in
22  those weekly Teams meetings where productivity falling
23  off was being discussed?
24     A    I don't know about that part -- those
25  particular meetings.  But for the most part, Christopher

Page 135

1  attended all of the meetings.
2     Q    I'm a little confused by what you're saying in
3  there.
4     A    Because the only way that you can miss a
5  meeting is if you're absent for the day.  That's the
6  only way that you can miss the meeting.  Nothing else
7  will stand for you to miss the meeting.
8          So, if Christopher was clocked in, he was at
9  the meeting.  And for the most part, he didn't miss too
10  many days of when we were conducting our meeting,
11  everyone was usually there present for our meetings.
12     Q    And these Teams meetings were happening when
13  all of the billing specialists were working from home
14  due to the pandemic?
15     A    Yes.
16     Q    Do you know who Jocelyn Maxeus is?
17     A    Yes.
18     Q    For the record, I believe Jocelyn is
19  J-O-C-E-L-Y-N, but I think I've also seen it spelled
20  with an S where the C goes.  But either way and Maxeus
21  is going to be M-A-X-E-U-S.  Okay.  Who was Ms. Maxeus?
22     A    She was a billing specialist.
23     Q    Do you know how long Ms. Maxeus worked with
24  Chrysalis as a billing specialist?
25     A    I know it was over three years.

Page 136

1     Q    The years that Ms. Maxeus worked for
2  Chrysalis, did you always supervise her?
3     A    No.
4     Q    Did you ever supervise her?
5     A    Yes.
6     Q    Was Ms. Maxeus terminated while you were her
7  billing manager?
8     A    Yes.
9     Q    Was Ms. Maxeus terminated on the same day as
10  Mr. Guarnizo?
11     A    Yes.
12     Q    Was Ms. Maxeus terminated for the same reason
13  as Mr. Guarnizo?
14     A    Yes.
15          MR. COSTALES:  Terminated?
16          MR. CUMMINGS:  Somebody say something.
17          MR. COSTALES:  Did you say terminated?
18          MR. CUMMINGS:  Terminated, right.  Yeah.  My
19     last question was, "Was Ms. Maxeus terminated for
20     the same reason as Mr. Guarnizo" and Ms. Ewing
21     said, "Yes."
22  BY MR. CUMMINGS:
23     Q    Okay.  Did Ms. Maxeus receive a counseling and
24  disciplinary action the same as Mr. Guarnizo as in
25  Exhibit J?

Page 137

1     A    Can you show me Exhibit J so I could just --
2     Q    Yeah.  No problem.
3     A    I prepared one for her.  Yes.
4     Q    Were Ms. Maxeus' attendance and productivity
5  datas attached to her disciplinary action also?
6     A    It would have been attached to the e-mail.
7     Q    E-mail?  Okay.  And is that the same for Mr.
8  Guarnizo?
9     A    Yes.
10     Q    So, Mr. Guarnizo would've been sent an e-mail
11  that showed his productivity from ECR and his attendance
12  from Paycom?
13     A    So, in order for me to gather my information,
14  I would have sent those items to my director.  If I
15  attached those spreadsheets to the actual invite of the
16  termination, I'm not sure.  But there would be the
17  document to back up what's listed here on this
18  disciplinary action form.
19     Q    Got it.  And so my own real question is, did
20  the billing specialist in particular Mr. Guarnizo, did
21  they receive the documentation that states they were not
22  being productive and they weren't -- or they were
23  falsifying time?
24     A    I'm not sure if he received it that day.
25  However, if he would have wanted to or if Jocelyn or

UNIVERSAL
COURT REPORTING
THE FREE VIDEO COMPANY

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 138..141

Page 138

1   whoever would have wanted to, it would have been
2   provided.
3       Q    Is -- Ms. Maxeus, is she a black woman?
4       A    Yes.
5       Q    Do you remember about how old she was in
6   December 2020?
7       A    No.
8       Q    Do you know if Ms. Maxeus had any
9   disabilities?
10      A    No.
11      Q    When Ms. Maxeus was terminated, was she
12  working from home?
13      A    Yes.
14          MR. CUMMINGS:  Just give me one second.
15          THE WITNESS:  Okay.
16  BY MR. CUMMINGS:
17      Q    Okay.  I'm going to now show you Exhibit M.
18  Can you see the document I'm showing you on my screen,
19  Ms. Ewing?
20          (Thereupon, Plaintiff's Exhibit M was entered
21          into the record.)
22      A    Yes.
23  BY MR. CUMMINGS:
24      Q    All right.  So, here we have a counseling and
25  disciplinary action for Jocelyn Maxeus.

Page 139

1          MR. CUMMINGS:  And for the Court Reporter, the
2          spelling is up here now, so that's where I would've
3          got it from.
4   BY MR. CUMMINGS:
5       Q    But here -- let me just delete all of that.  Do
6   you recognize this document, Ms. Ewing?
7       A    Yes.
8       Q    Okay.  I don't see any signature at the bottom
9   of this, and I think this is the only thing I received
10  as far as the pages.  So, do you know if you wrote up
11  this particular disciplinary action for Ms. Maxeus?
12      A    I do not know.  I know I was her supervisor or
13  manager at the time.
14      Q    Okay.  Now -- and when you say the time, you
15  mean in July 2020?
16      A    Correct.  Correct.
17      Q    All right.  Take a second to read this over
18  and let me know when you're done.
19      A    Okay.  You can go down.  Okay.  Yes.
20      Q    Okay.  All right.  Even though we don't see
21  signatures at the bottom of this particular document in
22  Exhibit M, do you -- after reading this document, do you
23  remember writing something like this up?
24      A    Yes, I do.
25      Q    Okay.  Can you say that you are the manager

Page 140

1   that wrote up this particular disciplinary action for
2   Ms. Maxeus in July 2020?
3       A    Yeah.  Sorry.  Yes.
4       Q    Okay.  And it seems like Ms. Jocelyn missed
5   one of the meetings that you were previously talking
6   about, like a weekly Teams meeting?
7       A    That was actually the first initial meeting
8   that started off all of our meet -- weekly meeting.  So,
9   I remember this because, yes, this was our actual first
10  meeting.
11      Q    This was the first weekly virtual Teams
12  meeting?
13      A    Yes.  Because this is when our director Lewis
14  Woodell came on board.
15      Q    Okay.  So, Mr. Woodell joined Chrysalis in the
16  middle of the pandemic?
17      A    Correct.
18      Q    Was it Mr. Woodell's idea to have the weekly
19  team meetings?
20      A    Yes.  And this meeting here was just an
21  introductory to get to know everyone on the staff.
22      Q    Were you also working from home at this time,
23  in July 2020?
24      A    Yes.
25      Q    All right.  Is it fair to say that in this

Page 141

1   meeting you're not also -- I'm sorry.  Start over.  Is
2   it fair to say that in this disciplinary action you are
3   letting Ms. Maxeus know that she has to make other
4   meetings, but also that her productivity is down for a
5   particular week or two?
6       A    Yes.
7       Q    Okay.  Got it.  Now, at this time in July
8   2020, had you already noticed that Mr. Guarnizo's
9   productivity was falling off?
10      A    I am not sure.
11      Q    All right.  And now I'm going to move over to
12  Exhibit N.  And I want to show you a performance
13  improvement plan for Ms. Maxeus.  This is also a one-
14  page document.  Do you recognize this document?
15          (Thereupon, Plaintiff's Exhibit N was entered
16          into the record.)
17      A    Yes.
18  BY MR. CUMMINGS:
19      Q    Okay.  Take a second to read it over and let
20  me know when you're done.
21      A    You can scroll down.  Okay.
22      Q    Okay.  All right.  So, is this a performance
23  improvement plan that was given to Ms. Maxeus in July
24  2020?
25      A    Yes.

## CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 146..149

Page 146

1   A   ECR.  Paycom, if you work eight hour -- a
2  whole eight hour day, you will show eight hours in
3  Paycom.  If you only work six, then it'll show six. But
4  that and the -- that should coincide with ECR, you know,
5  subtracting 30 minutes to an hour because you have to
6  answer e-mails.  If you're answering e-mails, you're
7  most likely not in ECR.  You may, you may not be.
8   Q   I see.  Okay.  Got it.  All right.  So, now --
9  but I was really just trying to pinpoint the number. So,
10  ECR should inform you that a billing specialist has
11  worked seven and a half hours that particular day?
12  A   Yes.
13  Q   Okay.  And you said it's seven and a half
14  because a half hour is deducted from the workday for
15  checking e-mails?
16  A   Yes.
17  Q   What about the 15-minute breaks that employees
18  received?  Where is that factored in?
19  A   That's text factor, that's why if you notice
20  on one of the documents, I don't remember what exhibit
21  it was, it says seven hours.  So --
22  Q   Okay.  And that's -- I was actually getting
23  ready to go back to that one because that was going to
24  be my next question for you.  All right.  So, the
25  document you're talking about was Exhibit N, which is

Page 147

1  this performance improvement plan for Jocelyn Maxeus.
2   And I did notice on here that it say
3  productivity should be at least seven hours a day.  And
4  so can you please just explain to me really quickly why
5  you wrote seven hours here?
6   A   Yeah.  Because, again, you have your two
7  15- minute breaks, and then you may have e-mails, you
8  may not have e-mails.  Most of the staff does not
9  receive
10  e-mails.  It all depends on your payer.  It all depends
11  on your job responsibilities.
12   So, between seven to seven and a half, if you
13  have seven hours of productivity in ECR, you're okay.
14  If you have seven and a half, perfect.  But you're not
15  going to be reprimanded for just having seven, no. Seven
16  is okay.
17  Q   Got it.  Okay.  So, seven is the minimum
18  amount of hours that somebody should be clocking per day
19  when you add up their ECR data?
20  A   That's correct.
21  Q   Okay.  Now, going back to ECR, and I believe
22  this was -- this is going to be Exhibit K that I showed
23  you before for Mr. Guarnizo, his ECR data from November.
24  That's what this document shows, right?
25  A   Yes.  That would show the amount of hours in

Page 148

1  ECR.
2   Q   Okay.  So, let's just take November 30th.  We
3  can see the November 30th.  All of the input in ECR that
4  Mr. Guarnizo had is on Pages 1 and Pages 2, correct?
5   A   Correct.
6   Q   All right.  How do you -- or how is his time
7  calculated using this particular data?  The amount of
8  time that he worked on November 30th?
9   MR. COSTALES:  Objection, form.
10  A   So, I would begin at the 14:48.  So, I know
11  that his first account worked was the -- started at
12  14:48, and then I will count the number of hours.
13  So, from 14:48 to -- what's that?  14:37?
14  That's what he worked in that hour.  And then it skips
15  all the way down to 10:37.
16  But as you can see, that's literally just
17  minutes within time, 10:37 to 10:32.  So, all of that's
18  calculated.  And then you have 09:46, 09:43.  The --
19  you're only -- and me looking at this document, he only
20  worked in -- inside of ECR for what?
21  What's that?  10 minutes?  10:37, what's that?
22  To 10:32.  That's five minutes.  So, that's how I would
23  add that up.
24  BY MR. CUMMINGS:
25  Q   Okay.  Understood.  So, looking at the same

Page 149

1  data set that you're looking at now, and we can see that
2  this is also in reverse chronological order.  I'm going
3  to go down to the page -- second page --
4   A   Um-hum.
5   Q   -- and look at where it says November 30th,
6  2020, 08:43.  That means 08:43 in the morning, right?
7   A   Correct.
8   Q   Okay.  So, we can see --
9   MR. COSTALES:  I'm sorry, Toussaint, where you
10  at?
11  MR. CUMMINGS:  Oh, okay.  Let me highlight it.
12  MR. COSTALES:  Okay.
13  MR. CUMMINGS:  So, it's easier.  All right.
14  And just for the record, I'm in the middle of Page
15  2 of Exhibit K.
16  MR. COSTALES:  You can use the Bates Stamps
17  too.
18  BY MR. CUMMINGS:
19  Q   Exactly.  Right.  This is Bates Stamp Number
20  160 in Chrysalis' production.  So, if I'm reading this
21  correctly, Ms. Ewing, does this mean that he essentially
22  logged -- Mr. Guarnizo logged into ECR at 08:43 in the
23  morning?
24  A   No.  This is when he logged into his first
25  client.

**Page 150**

```
1      Q    Okay.
2      A    You can be on ECR and don't do anything.
3      Q    Okay.  Got it.  Paycom will tell you the time
4  he logged in?
5      A    No, no, no.  Remember, Paycom is just his time
6  sheet.  This report just shows when he logged into his
7  first client.  There's another report that can show you
8  when he actually logged into ECR, but this report is
9  just showing when he logged into his first client.  You
10 see it says patient date of view.
11     Q    Right.
12     A    He logged into an actual client's account.
13     Q    Okay.  And that's what Chrysalis considers as
14 work being done when you're in a client account?
15     A    That's correct.
16     Q    I see.  Okay.  All right.  So, is it fair to
17 say that on November 30th, 2020, he's in a --
18 Mr. Guarnizo is in a client account from 08:43 to 08:49?
19     A    He can be -- I mean, it's pretty consistent.
20 So, I would say 08:43 to 08:50.  Now, he can be working
21 into the same client.
22     Q    Um-hum.
23     A    That can all be in the same client because
24 it's things that you can do to be in a client's account
25 for 10 minutes.
```

**Page 151**

```
1      Q    Okay.  But -- sorry, go ahead.  Um-hum.
2      A    Yeah.  From that can be the same client, but
3  he had active activity during these times.  That's just
4  what --
5      Q    Got it.  Okay.
6      A    Still considered active activity all the way
7  from 08:43, all the way up for the nine o'clock.  09:16
8  to 09:38.  You know, me personally, I would've said,
9  okay, still active activity.
10          It's -- even though it's like almost a
11 20-minute gap.  But he could be on the phone, he could
12 be checking another website.  It's active activity.
13     Q    Um-hum.
14     A    You can keep going up.  So, then we go from
15 09:46 to 10:32 for me, that's not active activity
16 because again, what did you do for almost an hour?
17     Q    Okay.  So, now that gap in time between 09:46
18 and 10:32 here is a problem when you're auditing this
19 data?
20     A    Yes.
21     Q    Okay.  If there's no explanation for what was
22 happening in that, you know, 50-minute or so period.
23     A    Exactly.
24     Q    Okay.
25     A    The major concern will come in from 10:37 all
```

**Page 152**

```
1  the way to 14:37.  That's hours of a gap, so --
2      Q    Got it.  Okay.  Understood.  All right.  And
3  this data that I'm looking at here from the month of
4  November, which is Exhibit K, can you say this is the
5  first time that you went and looked at Mr. Guarnizo's
6  data when he was working from home?
7      A    No.
8      Q    Okay.  Do you know for a fact if you had
9  looked at other months to check Mr. Guarnizo's ECR
10 activity?
11     A    Weeks, other weeks.
12     A    Other weeks okay.
13     A    We ran this report weekly.  So --
14     Q    Weekly.  And at some point when you first
15 started noticing big gaps in Mr. Guarnizo's productivity
16 data from ECR, did you address that with him?
17     A    Yes, verbally.
18     Q    Verbally.  When he was working from home,
19 would you call Mr. Guarnizo on the phone and speak to
20 him verbally that way?
21     A    We've had phone conversations, yes.  But with
22 this particular issue, I'm sure it would have been
23 through Teams.  I mean -- but we did have phone
24 conversations
25     Q    Sticking particularly with his productivity
```

**Page 153**

```
1  issue, if it was a Teams meeting, would Mr. Woodell,
2  Lewis Woodell also had been on that Teams meeting?
3      A    May have, may have not.
4      Q    But either way, Mr. Guarnizo never was put on
5  a performance improvement plan for his productivity.  Is
6  that right?
7      A    I'm not sure.  If you don't have the document
8  then, you know -- I can't remember that far back.  If he
9  was or if he wasn't.
10     Q    Did Ms. Maxeus ever improve her productivity
11 after she was placed on that July 2020 performance
12 improvement plan?
13     A    I cannot remember that far back.
14     Q    Would Ms. Maxeus have been terminated if she
15 had improved her productivity after that performance
16 improvement plan in July 2020?
17     A    She would not have been terminated if she
18 would have improved.
19     Q    Was anybody else beside -- sorry.  Were any
20 other billing specialist besides Mr. Guarnizo and Ms.
21 Maxeus terminated in 2020 based on productivity?
22     A    2020?  No.
23     Q    Okay.  And what I'm more so referring to is
24 during the time period when billing specialists were
25 working from home, but you already clarified earlier
```

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 154..157

Page 154

1  that people seemed to work from home for a very extended
2  period of time moving on into 2022, right?
3      A    Yes.
4      Q    Okay.  All right.
5      A    There was one other individual that was
6  terminated due to their time, if I'm not mistaken.
7      Q    Was that Deidre?
8      A    No.
9      Q    Deidre was early?
10     A    Yes.
11     Q    You mean before the pandemic?
12     A    Yes.
13     Q    Okay.
14     A    I do not recall the young lady's name at the
15  time, but it was someone and at that time, I believe
16  that individual was inside the office.
17     Q    Okay.  Was the person who you're referring to,
18  the billing specialist, terminated before or after Mr.
19  Guarnizo?
20     A    After.
21     Q    Was the person your -- oh, so then necessarily
22  she was terminated after Ms. Maxeus too, right?
23     A    Correct.
24     Q    Okay.  The -- let me show you something. When
25  you went through these --- the ECR data for your billing

Page 155

1  specialist, was that considered a billing team audit?
2      A    Yes.
3      Q    And was it just you and Mr. Woodell that were
4  conducting the audit or was it just you?
5      A    It was myself, Lewis Woodell, and Frederica
6  Pridgeon.
7      Q    Could you spell that last name and tell me who
8  that person is?
9      A    Pridgeon.  P-R-I-D-G-E-O-N.
10     Q    Okay.  And her first name was Frederica?
11     A    Yes.
12     Q    Who is she?
13     A    She's the lead billing specialist.
14     Q    Okay.  So, she's a billing specialist who just
15  has more expertise than the other billing specialist on
16  the team?
17     A    That's correct.
18     Q    And she's not exactly a manager, but is, she's
19  sort of like a go-between, between the billing
20  specialist and the manager, the billing manager?
21     A    Correct.
22     Q    How did the -- that team you, Frederica, and
23  Lewis Woodell decide who you would -- which billing
24  specialist you would audit?
25     A    Again, it was -- we ran the report for the

Page 156

1  week for each employee.  I ran the report, Frederica
2  sorted it by their names and she gave it back to me for
3  review.  And it was not one particular person, it was
4  done for the entire team.
5      Q    Are you aware that Mr. Guarnizo informed
6  Chrysalis that he would to take time off for a medical
7  situation in October 2020?
8      A    I was aware that Christopher needed some time-
9  - not time -- I don't know how you say time off, but he
10  will be missing a few hours out of certain days because
11  he had Doctor's appointments.  That's what I was told.
12     Q    Who told you that?
13     A    Christopher.
14     Q    Oh, he -- okay.  How did he communicate that
15  to you?
16     A    If I'm not mistaken, it was via e-mail.
17         MR. CUMMINGS: Madam Court Reporter, which
18     exhibit am I up to?  O
19         THE COURT REPORTER:  One second.
20         MR. CUMMINGS:  Okay.
21         THE COURT REPORTER:  I think L.
22         MR. CUMMINGS:  You said L?
23         THE COURT REPORTER:  Yes.  Well, no.  I'm
24     sorry.  I'm sorry.  Wait.
25         MR. CUMMINGS:  No.  I'm way, past -- I'm way

Page 157

1  past L.  I'm pretty sure I'm on
2         THE COURT REPORTER:  Yeah.  You are way past L
3  but let me see.  Because my computer been giving
4  me--
5         MR. CUMMINGS:  Okay.  I'm just -- what I'll do
6  is I'll double check it afterwards, but I'm going
7  to make the next one Exhibit O.  So, I'm up to
8  Exhibit O for the deposition record?
9         THE COURT REPORTER:  Yes.  O.
10         MR. CUMMINGS:  And -- O?  Okay.  Thank you.
11     All right.
12  BY MR. CUMMINGS:
13     Q    So, Ms. Ewing, I'm now showing you Exhibit O
14  for the deposition record.
15         (Thereupon, Plaintiff's Exhibit O was entered
16         into the record.)
17  BY MR. CUMMINGS:
18     Q    And let me just point your attention to the
19  date.  Well, all of this information right here.
20     A    Okay.
21     Q    Can you see what I'm showing to you?
22     A    Yes.
23     Q    Okay.  All right.  So, we see an e-mail from
24  Christopher Guarnizo going to Lewis Woodell and Leslie
25  Lynch.  So, in October of 2020, Lewis Woodell would've

Page 158

1    been the billing manager, right?
2        A    Billing director.
3        Q    Billing director, sorry.  You were the billing
4    manager, okay.
5        A    Correct.
6        Q    Okay.  And who is Leslie Lynch again?
7        A    She's an executive at Chrysalis.
8        Q    What kind of executive?  Does she handle HR?
9        A    No.
10       Q    Okay.  Please take a second to read over Mr.
11   Guarnizo's e-mail and let me know when you're done.
12       A    Okay.
13       Q    Okay.  So, you've mentioned previously that
14   Mr. Guarnizo communicated to you that he was going to
15   need some time off for a medical situation.  We see this
16   e-mail is not directed to you.  It only goes to Lewis
17   Woodall and Leslie Lynch.
18            However, after reading the e-mail, does this
19   reflect your -- I'm sorry, does this refresh your memory
20   about any kind of conditions that Mr. Guarnizo
21   personally informed you about that he was having?
22       A    Well, Christopher has to communicate his time
23   off to me because I am the one that checks his Paycom.
24   So, Christopher told me that there will be days that he
25   will be either clocking in later after he leaves some of

Page 159

1    Doctor's appointments or clocking in early.
2            That's how I was made aware that he had some
3    appointments coming up.  That's all that I was told by
4    Christopher.  I never received this document or none of
5    this was communicated to me, so --
6        Q    Okay.  And let's be specific here.  He's
7    talking about having to go to the Doctor's due to a low
8    hemoglobin result.  Do you ever remember hearing him
9    mention that to you?
10       A    No.  Christopher only said he had a few
11   Doctor's appointments.
12       Q    Okay.  He did not mention internal bleeding to
13   you or medical procedures that he may have to have?
14       A    Nothing at all.
15       Q    Is there a reason why he would not have
16   included you on this e-mail that you can think of?
17            MR. COSTALES:  Objection, form.
18       A    I don't know why he wouldn't.  I mean, I am
19   not the head of the department, so maybe he just felt I
20   couldn't make those decisions.
21   BY MR. CUMMINGS:
22       Q    Was it improper for Christopher to send this
23   e-mail to Lewis Woodall and not cc -- at least cc you on
24   it?
25       A    No, he's actually following the correct

Page 160

1    command -- chain of command.
2        Q    And then moving down same day, this is October
3    1st, 2020 at 08:52 a.m. that Mr. Guarnizo sends his e-
4    mail and we see a response from Lewis at 11:39 a.m. and
5    now, he has also cc'ed Jennifer Blue on the email.  Is
6    Jennifer Blue a human resources manager?
7        A    Yes.
8        Q    You hesitated a little bit.  Why'd you
9    hesitate?
10       A    Oh, only because she's no longer with us.  So,
11   at that time.
12       Q    Okay.  Understood.  Got it.  All right.  But
13   at -- in the 2020, Jennifer Blue worked for Chrysalis
14   and she worked in human resources, right?
15       A    Yes.
16       Q    Okay.  And as far as you know, was Christopher
17   supposed to communicate this request for time off to
18   Human Resources as well?
19       A    If it's a few days or certain periods of time
20   out of the day, if you're working half a day or you just
21   need a few days off, no, but if he would have wanted a
22   longer period of time off, I would think that he would
23   contact HR.
24       Q    Okay.  And so Lewis Woodell never communicated
25   any specific medical issues that Mr. Guarnizo was having

Page 161

1    to you.  Is that right?
2        A    That's correct.
3        Q    Leslie Lynch never communicated any specific
4    medical issues Mr. Guarnizo was having to you?
5        A    That's correct.
6        Q    Jennifer Blue never communicated any specific
7    medical issues that Mr. Guarnizo was having to you?
8        A    That's correct.
9        Q    All right.  We see that the e-mail I just
10   showed you was from October 2020.  Do you know if your
11   audits of Mr. Guarnizo's Paycom and ECR data happened
12   before or after this time period in October 2020?
13       A    So, it -- I had to run the reports after.  I
14   can't run the report until after the days are done.  So,
15   if I'm giving you a report for November and October, I
16   had to run the report after those dates.  So, --
17       Q    Oh, sorry, I apologize.  What I meant was you
18   indicated that these audits weren't being done
19   throughout the whole year in 2020.  And I believe what
20   you said was that when it became a problem that the
21   claims denial rate was like going up, that's when you
22   and Lewis decided, "Oh, we're going to start auditing
23   the specialist."  Is that right?
24       A    Yes.
25       Q    Okay.  So, that time period, that's what I'm

CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 162..165

Page 162

1  referring to more so.  Do you know if in particular,
2  Chris's -- Christopher Guarnizo's productivity was being
3  checked before he informed Chrysalis about his medical
4  conditions in October 2020?
5      A    We were running the productivity reports
6  before, yes.
7      Q    Okay.  And they were being run -- the
8  productivity reports were being run for all of the
9  billing specialists before October 2020?
10         MR. COSTALES:  Objection, form.
11     A   That's correct.
12         MR. CUMMINGS:  And Madam Court Reporter, I
13     know you have to go around 03:00, I should be done,
14     but I am keep an eye on the time for you. However,
15     I'm not sure if Mr. Costales is going to have
16     questions also.
17         MR. COSTALES:  I don't have any questions, no.
18         MR. CUMMINGS:  Okay.
19  BY MR. CUMMINGS:
20     Q    All right.  Ms. Ewing, I'm going back to
21  Exhibit J, the termination letter or the counseling and
22  disciplinary action.  When we go under the statement,
23  and we're looking here where it says action taken.
24     A   Um-hum.
25     Q    And then we go to termination of employment.

Page 163

1  Do you remember filling out any other counseling or
2  disciplinary actions from Mr. Guarnizo yourself before
3  December 2020?
4      A   Yes.
5      Q    And in preparation for this deposition, did
6  you see any of the documents or disciplinary actions
7  that you filled out from Mr. Guarnizo before December
8  2020?
9      A   No.
10     Q    What did you write or what disciplinary
11  counsel and actions did you write Mr. Guarnizo up for
12  before December 2nd, 2020?
13     A   I am not 100% sure.  I just can tell you what
14  I remember.  And it was based on Christopher's
15  efficiency when it came to his productivity.
16     Q    All right.  So, if you remember, I showed you
17  a lot of documentations of discussion, documentations of
18  supervision.  We saw a performance improvement plan for
19  Mr. Guarnizo, but they were all during the time that he
20  was a data specialist, correct?
21     A   That's correct.
22     Q    All right.  And the last one we saw was in
23  2017.  So, then the first document I see where your name
24  is on it, and it says that Mr. Guarnizo is a billing
25  specialist, is the one that I just showed you at Exhibit

Page 164

1  J, which is when he's being terminated.  So, -- sorry,
2  say that again.
3      A   No, no.  I said that's correct.
4      Q    Right.  Okay.  Should there be other documents
5  of discussion, documents of supervision, or counseling
6  and disciplinary actions between the last one I showed
7  you in 2017, and the one that you're looking at right
8  now with your name on it where Mr. Guarnizo is a billing
9  specialist and you are his supervisor?
10         MR. COSTALES:  Objection, form.
11     A   Yes.  Yes, there should be.
12  BY MR. CUMMINGS:
13     Q    Do you know how many of those documents there
14  would be?
15     A   No.
16     Q    All right.  I'm now going to show you Exhibit
17  P for the deposition record.
18         (Thereupon, Plaintiff's Exhibit P was entered
19         into the record.)
20  BY MR. CUMMINGS:
21     Q    Okay.  This is an e-mail from Mr. Guarnizo on
22  December 3rd, 2020, which is addressed to Jennifer Blue,
23  Lewis Woodell, Qewing@chrysalishealth.com.  Is that your
24  e-mail?
25     A   Yes.

Page 165

1      Q    Okay.  And then L Lynch, which would be Leslie
2  Lynch.  Please take a second and read over this email
3  that Mr. Guarnizo wrote.
4      A   Okay.
5      Q    Okay.  So, I just want to focus your attention
6  on the second paragraph which I'm highlighting here.
7  And in the first sentence of the second paragraph
8  Mr. Guarnizo says that he wants to confirm that he'll be
9  given reports showing the decrease in this productivity
10  for the month of October and November that we spoke
11  about yesterday.
12     A   Um-hum.
13     Q    So, let me just ask this question.  Was
14  Mr. Guarnizo being terminated for the drop off in his
15  productivity from October and November of 2020?
16     A   Yes.
17     Q    And no other months in 2020?
18     A   No.
19     Q    All right.  And when he -- at -- when he -- do
20  you remember him in the teams meeting where or whatever
21  meeting, Zoom, where he was being terminated, requesting
22  the reports to confirm his decrease in productivity for
23  October and November?
24     A   Not that I recall.
25     Q    Okay.  And then moving on to his second

## CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
Ewing, Quiana on 03/06/2023          Pages 166..169

Page 166

1  sentence, he says he's also requesting reports of a
2  write-up that was brought to his attention in the
3  earlier months during the beginning of the pandemic for
4  the same matter.
5          He said, I was told I would be given
6  documentation for it, but never received it.  Do you
7  know what Mr. Guarnizo is referring to there?
8      A   He may have been speaking of the write-up that
9  I was talking about, my computer crashed and I don't
10 have it.
11         MR. COSTALES:  I'm going to object to that
12     question as well.  There's been a lot of questions
13     about -- that calls for the Witness to speculate on
14     what somebody else thought about something and she
15     speculates on it.
16         So, I'm going to have a standing objection to
17     questions like, do you know why he didn't do this?
18     What was he thinking?  Why would he have done that?
19     Things of that nature.
20         MR. CUMMINGS:  Okay.  Noted.  In this
21     particular sentence though, what I'm asking
22     Ms. Ewing is where Mr. Guarnizo is writing her an
23     e- mail saying that he's requesting reports of a
24     writeup that was brought to his attention in the
25     earlier months during the -- beginning of the

Page 167

1      pandemic for his productivity.
2          He was told he would be given documentation
3      for it, but never received it.  And so the only
4      standard question is, does Ms. Ewing know what
5      Mr. Guarnizo is referring to here?  So, I'm not
6      asking her to speculate on anything.  I just want
7      to know Ms. Ewing, do you know --
8          MR. COSTALES:  Same objection.
9          MR. CUMMINGS:  Okay.
10         MR. COSTALES:  Okay.
11 BY MR. CUMMINGS:
12     Q   But you can answer Ms. Ewing, do you know what
13 Mr. -- what report Mr. Guarnizo is referring to here?
14     A   No.  Because I'm not 100% sure.
15     Q   Okay.  And then in the last sentence in this
16 paragraph it says, between August and September after a
17 group meeting, Quiana via phone informed me there would
18 be no write-up and solely be a warning.  So, do you
19 remember having a group meeting over the phone where you
20 told Mr. Guarnizo that he would not be written up and
21 only receiving a warning?
22     A   And this is a group meeting that I had amongst
23 all of the staff and productivity was spoke about, but
24 no one received any write-ups.
25     Q   And do you remember when this particular group

Page 168

1  meeting Mr. Guarnizo is referring to in the last
2  sentence happened?
3      A   No.
4      Q   Do you know if the group meeting happened
5  between August and September of 2020?
6      A   I can't remember.
7      Q   Do you remember receiving this e-mail that
8  we're looking at right now on December 3rd, 2020?
9      A   No.
10     Q   Did you ever respond to this e-mail from
11 Mr. Guarnizo?
12     A   No.
13     Q   Okay.  Why not?
14     A   I'm not sure.
15     Q   Was Mr. Guarnizo ever sent any reports that
16 showed his productivity from October and November of
17 2020?
18     A   I don't know.
19     Q   Did you ever send Mr. Guarnizo any reports
20 that showed his productivity from October and November
21 2020?
22     A   No.
23         MR. COSTALES:  Just to be clear, with
24     productivity, you're talking about the time records
25     or productivity reports or -- because I think

Page 169

1      there's a lot of times when you may ask a question
2      and you think you mean something.  I think the
3      Witness under -- I'm not sure that you're all on
4      the same page.
5          MR. CUMMINGS:  Well, I mean, I'm being just as
6      generic as the e-mail because he just says decrease
7      in productivity for the months of October and
8      November.
9          So, I'm not going to assume anything more than
10     what we see here.  But the main question is whether
11     or not Ms. Ewing sent Mr. Guarnizo any reports
12     after he was fired.
13 BY MR. CUMMINGS:
14     Q   So, did you send -- Ms. Ewing, did you send
15 Mr. Guarnizo any reports after he was fired?
16     A   No.
17     Q   Okay.  Did you send him anything at all after
18 he was fired?
19     A   No.
20     Q   Okay.  So, then -- and then going down to the
21 bottom of this e-mail thread on December 3rd, 2020 at
22 07:51 p.m. we see that Jennifer Blue responds to 'Mr.
23 Guarnizo and says, see attached pay stubs for 2020, as
24 well as the additional productivity report for October.
25 Were you aware that Ms. Blue responded to Mr. Guarnizo?



Page 174

```
 1   DATE:     March 25, 2023
     TO:       Quiana Ewing
 2   C/O
               Gary A. Costales, Esquire
 3             Gary A Costales P.A
               1533 Sunset Drive Suite 150
 4             Coral Gables, Florida 33143-5700
 5   IN RE:  Christopher Guarnizo vs. The Chrysalis Center
     Inc.
 6   CASE NO: 022-CV-60710
 7   Dear Ms. Ewing,
 8        Please take notice that on March 6, 2023, you gave
     your deposition in the above-referenced matter.  At that
 9   time, you did not waive signature.  It is now necessary
     that you sign your deposition.  You may do so by
10   contacting your own attorney or the attorney who took
     your deposition and make an appointment to do so at
11   their office.  You may also contact our office at the
     below number, Monday - Friday, 9:00 AM - 5:00 PM, for
12   further information and assistance.
13        If you do not read and sign your deposition within
     thirty (30) days, the original, which has already been
     forwarded to the ordering attorney, may be filed with
14   the Clerk of the Court.
          If you wish to waive your signature, sign your name
15   in the blank at the bottom of this letter and promptly
     return it to us.
16
     Very truly yours,
17
     Dlondra Goodman,
18   Court Reporter
     Universal Court Reporting
19   (954)712-2600
20   I do hereby waive my signature.
21
22
23   _____
     Quiana Ewing
24   Cc: via transcript:
                    Toussaint Marcus Cummings, Esquire
25
```

Page 175

```
 1   Errata Sheet
 2
 3   NAME OF CASE: CHRISTOPHER GUARNIZO vs CHRYSALIS CENTER
 4   DATE OF DEPOSITION: 03/06/2023
 5   NAME OF WITNESS: Quiana Ewing
 6   Reason Codes:
 7        1. To clarify the record.
 8        2. To conform to the facts.
 9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                    _____
```

